366 F.2d 915
 UNITED STATES of America, Appellant,
v.
531.13 ACRES OF LAND, MORE OR LESS, Situated IN OCONEE
COUNTY, STATE OF SOUTH CAROLINA, and J. P. Stevens
and Company, Inc., et al., Appellees.
UNITED STATES of America, Appellant,
v.
531.10 ACRES IN ANDERSON COUNTY, SOUTH CAROLINA, and Duke
Power Company, and Unknown Owners, Appellees.
 Nos. 10421, 10422.
 United States Court of Appeals Fourth Circuit.
 Argued June 1, 1966.
Decided Sept. 21, 1966.
 
 Edmund B. Clark, Atty., Dept. of Justice (Edwin L. Weisl, Jr., Asst. Atty. Gen., Roger P. Marquis and Howard O. Sigmond, Attys., Dept. of Justice, and John C. Williams, U.S. Atty., and Robert O. DuPre, Asst. U.S. Atty., on the brief), for appellant.
 David L. Freeman, Greenville, S.C., Wm. I. Ward, Jr., Charlotte, N.C., and William L. Watkins, Anderson, S.C. (Carl Horn, Jr., Gen. Counsel, Duke Power Company, Charlotte, N.C., on the brief), for appellees.
 Before SOBELOFF, BOREMAN and BRYAN, Circuit Judges.
 ALBERT V. BRYAN, Circuit Judge:
 
 
 1
 These two eminent domain cases arise out of the establishment by the United States of the Hartwell Dam and Reservoir Project,[1] a flood control venture on the Savannah River, the South Carolina-Georgia boundary. In each, claim was made for just compensation for 'rights' extinguished by the waters impounded by the Dam. In No. 10,421, the claimant is J. P. Stevens & Company, Inc.; in No. 10,422 the Duke Power Company.
 
 
 2
 Claimants were riparian owners along the Seneca River, a source-tributary in South Carolina of the Savannah. Acceptable compensation has been made to them for such fast land as was acquired or inundated by the Government in the undertaking. The sole question is whether it must also compensate Stevens for the loss of its waste-disposal use of the Seneca, and Duke for the loss of water power, all of which were enjoyed before, but were lost contemporaneously with, the impounding of the water.
 
 
 3
 The action against Stevens was begun August 9, 1960, that against Duke on October 21, 1960. A Commission was appointed by consent under F.R.Civ.P. 71A(h) to hear these and other cases together. It reported the claims as sustained in fact and in law, and fixed the compensation considered just and reasonable therefor. The District Court reached the same conclusions of independent findings as well as in approval of those made by the Commission. On the Government's appeal opposing any allowance whatsoever for the alleged losses, we reverse, holding that neither claim represents a vested property right of the condemnee.
 
 
 4
 The Seneca River commences in Anderson County, South Carolina, as a continuation of the Keowee River, and courses southeasterly for approximately 27 miles before joining the Tugaloo, at the now abandoned town of Andersonville, to form the Savannah River. The Stevens property, on which stands its Utica Mohawk textile plant, is located on the Seneca, about 22.5 miles upstream from the Savannah's beginning at Andersonville. The Duke property, consisting of a dam, reservoir and hydroelectric machinery, is also on the Seneca at Portman Shoals, 8 miles above the formation of the Savannah. The Hartwell Dam is on the Savannah, 5 miles below Andersonville.
 
 
 5
 In width from 100 to 200 feet, with well-defined banks, the Seneca has an average depth of 3 to 4 feet. In its 27-mile reach to the Savannah, it falls 111 feet. Along the way, Portman Shoals extends for about 3 miles, descending 52 feet or an average of 17.37 feet per mile. Its depth at the Shoals varies from 1 to 2 1/2 feet.
 
 
 6
 The navigability of the Savannah at Hartwell Dam is undisputed. The chief controversy at trial was whether the Seneca was navigable as far up, respectively, as the Stevens and Duke holdings. Both the Commission and the District Court found it not to be a navigable stream at and between these locations. The allowance of Stevens' and Duke's claims rested on this determination. The reasoning was that the sovereign power of the United States over its waters, derived from the Commerce Clause of the Constitution, United States v. Appalachian Power Co., 311 U.S. 377, 404, 61 S.Ct. 291, 85 L.Ed. 243 (1940), does not embrace nonnavigable streams; that the privileges enjoyed by Stevens and Duke, and erased by the impoundment of the Hartwell Dam, were not being exercised in a navigable stream; and therefore these were private rights which could not be taken without compensation. As our decision is not based in either instance upon the navigability or nonnavigability of the Seneca, we have no occasion to deal with this question.
 
 The Stevens Case
 
 7
 The stevens property consisted of 905.64 acres, of which the Government took 509.64 in fee and 21.49 in easements, a total affected acreage of 531.13. The original tract was roughly square, the Seneca River forming its east boundary, and Martin's Creek, which eventually enters the Seneca, forming most of the south boundary. The textile plant occupied 17 acres in the center of the square, but it was not included in the condemnation. Waste waters from the plant were discharged into an open ditch about 2800 feet in length, which emptied into Martin's Creek. The latter ran for 3300 feet before it joined the Seneca, some 22 1/2 miles above Andersonville. For this distance Stevens owned, in fee or by easement, both sides of Martin's Creek. The Government's take embraced all of Stevens' interest in Martin's Creek, the open ditch and the land lying between the plant and the Seneca, extending to the river's ordinary highwater line.
 
 
 8
 The wastes, aside from treated domestic sewage, consisted daily of some 2,500,000 gallons of water, originally taken from the river and used in bleaching, dyeing, and finishing cloth. In the process starches and spent dye-stuffs were picked up, with the result that the discharge had a color of 'strong coffee to weak tea'. Indisputably, the waters of the creek were 'heavily' or 'grossly' polluted thereby. The contamination, principally, was a strong caustic alkalinity, not injurious to fish, livestock, irrigation and probably inconsequential to swimmers. Despite this infiltration, the Seneca waters, before the coming of the Hartwell Reservoir, met the Class C rating of the Sough Carolina Pollution Control Authority.[2] It had issued a Class C permit to Stevens for the discharge into Martin's Creek and the Seneca.
 
 
 9
 The Hartwell Dam created a vast storage reservoir or lake behind it, overflowing and obscuring large areas beside the upper tributaries of the Savannah. This impound was devoted incidentally to public recreational purposes, such as boating, fishing and swimming. Important here, the backup of the waters destroyed the flow and outfall from Stevens' open ditch into Martin's Creek and the flow of the latter into the Seneca.
 
 
 10
 In view of the reservoir's recreational functions, the State Water Pollution Authority, in admittedly valid procedings, reclassified the receiving waters of the Seneca to Class A. This change, dictated by the 'human element'-- concern for the health of swimmers-- meant that the river must be maintained in a purer condition than Class C waters, the higher standard excluding the reception of Stevens' wastes. After conferences and the rejection of several of its proposals, Stevens obtained a Class A permit on condition that it build, as it did, a disposal facility. This unit consists of a tower located on the Seneca's bank, with a foundation 60 feet beneath the lake's surface. The wastes are piped to the tower, there diluted with lake water, then pumped into a dispersal system and thence discharged into the lake through nozzles 50 feet below the lake level.
 
 
 11
 Stevens' argument for compensation is this: with Martin's Creek and the Seneca in their natural condition, the dumping of its untreated wastes into them was permissible as an inherent riparian property right; the Hartwell Project, in converting the creek and river into public recreational waters, brought about the river's reclassification; ergo the necessity for the installation of the disposal plant was directly and immediately attributable to the Government's action. In this connection Stevens refers to the testimony of the Authority's director that, but for the creation of the storage pool, Stevens could have continued indefinitely with the ditch-creek-river discharge. In this fashion Stevens endeavors to counter the Government's assertion that the decision of the Authority, and not the act of the United States, was the real cause of the river's reclassification and Stevens' outlay for the disposal plant.
 
 
 12
 The Commission and the District Court found that the cost of the construction and operation of this plant represented the fair value of the disposal privileges enjoyed by Stevens before the creation of the reservoir. As compensation for this loss, Stevens was awarded $550,000. The justness of this amount, if by law recoverable, is not challenged.
 
 
 13
 In our opinion Stevens' position is untenable, and the award cannot stand. Even if the Government is chargeable with preventing this use of the streams by Stevens, in doing so it took nothing belonging to Stevens. No absolute right, we hold, was vested in Stevens under the law of South Carolina to discharge industrial wastes into Martin's Creek or the Seneca River. Utilization of the South Carolina streams is subject to the rights of other riparian owners, enforceable by them or by the Pollution Authority. The latter's control was exerted here in the reclassification and the legality of this action is not disputed. Indeed, the State's power was acknowledged by Stevens in seeking and obtaining initially the Class C permit and later the Class A permit. The fundamental and determinative question in this control, either at the instance of another proprietor or of the State, is the reasonableness of the use.
 
 
 14
 The State statute outlaws the discharge into streams of anything that may 'cause or tend to cause a condition of pollution in contravention of the standards adopted by the Authority'. 70-116. Control of this kind by the State in unassilable. Texas Co. v. Motgomery, 73 F.Supp. 527, 534 (E.D.La.1947) (3-judge court) aff'd 332 U.S. 827, 68 S.Ct. 209, 92 L.Ed. 402. The common law of South Carolina provides a downstream owner with equivalent civil protection. Thus, even without the creation of the lake, Stevens could not with immunity have continued the objectionable efflux if a lower owner on the Seneca had adapted his riparian proprietorship to recreational purposes, undeniably a reasonable use. The effluence could have been stopped under either the common law or the statute.
 
 
 15
 In Duncan v. Union-Buffalo Mills Co., 110 S.C. 302, 96 S.E. 522, 524 (1917) the following jury instruction was approved:
 
 
 16
 "Owners of land on the banks of a stream are entitled to the reasonable use of the stream; that they can use the stream for their own purposes to a reasonable extent; that while it is true that a stream must not be polluted, still this does not mean that nothing can be put in the stream; but that nothing can be put therein that will deprive the landowners below to the reasonable use of the steam."
 
 
 17
 No contrary pronouncement of the South Carolina common law was uttered in Omelvany v. Jaggers, 2 Hill (SC) 634 (1835). The case is cited by Stevens as support for its contention that the Government cannot destroy, without indemnification, a use by Stevens which was reasonable under the natural conditions of the river. Omelvany simply held that a lower owner could not by a dam or other construction 'throw back' the water so as to interfere with the flow past the upper riparian owner's property. Also cited, White v. Whitney Mfg. Co., 60 S.C. 254, 38 S.E. 456 (1901) is to the same effect.
 
 
 18
 But that of course is not Stevens' complaint. Its grievance is that it can no longer put refuse into Martin's Creek or the Seneca. Plainly this is not a problem of flow, but rather of what ingredients can be put in the water. Stevens' difficulty is the prohibition against pouring a deleterious additive into the creek or river. We see no merit in this plaint.
 
 
 19
 Throughout it must be remembered that Stevens does not complain that it has been robbed of the natural drainage of surface waters from its land. Hence we are not called upon to say whether under the law of South Carolina such drainage is an appurtenant right. Cf. United States v. Kansas City Life Ins. Co., 339 U.S. 799, 810, 814, 70 S.Ct. 885, 94 L.Ed. 1277 (1950) and dissenting opinion. Nor has Stevens' access to the river for riddance of its wastes been blocked, notwithstanding the taking of the area between the industrial plant and the river. For our decision, it may be assumed that before the condemnation Stevens' ownership extended to the center of Seneca's bed, thus conceding arguendo Stevens' contention that the river was nonnavigable.
 
 
 20
 The bar interposed by the Water Pollution Authority to Stevens' dumping of wastes into the river was, obviously, undertaken as a health measure well within the State's police power. The United States had not protested the infusion of the wastes into the reservoir. The objection emanated from the Authority. Thus, if Stevens deemed the restriction unreasonable, its remedy was to apply to the Authority for relief and if unsuccessful there, to pursue the further corrective steps provided by the statute.[3] Certainly the ban created no obligation upon the United States to make good the loss.
 
 
 21
 Our decision to disallow compensation is not at odds with Town of Clarksville, Virginia v. United States, 198 F.2d 238 (4 Cir. 1952), cert. den. 344 U.S. 927, 73 S.Ct. 495, 97 L.Ed. 714 (1953). The United States by damming the adjacent nonnavigable river flooded almost half of the Town, the condemnee, and rendered its sewerage system useless. As compensation for what it destroyed the Government agreed to provide, or pay for, an equivalent substitute system. It also agreed to include therewith a sewerage treatment plant, pumping or lift stations and the cost of the latter's operation should the condemnation court hold that such accessories were indispensable to constitute the new system a just equivalent of the old. The State Water Control Board had ruled that the new system could not empty into the river unless a treatment plant was installed, although none had been included previously. We held that the District Court erred in not requiring the Government to provide these additional facilities, because they were thought necessary to fulfill the Government's pledge that the new should be equal of the old system.
 
 
 22
 But here the Government, to repeat, took no part of Stevens' disposal plant and concede no obligation whatsoever to the condemnee, as it did in Clarksville. The only question there was the amount of compensation; here liability for any amount at all is the issue. Stevens had no vested right to contaminate the watercourses. It was creating the wastes as a part of a private operation and the elimination of the pollution was Stevens' responsibility. The cost of a satisfactory alternate method must be borne by Stevens, and cannot be shifted to the United States.
 
 
 23
 The noncompensability of Stevens' claim has thus far been pitched upon State laws, under which continued indulgence to defile a stream has been found not to be a legal right. Recently, Congress by Act of October 2, 1965, P.L. 89-234, 79 Stat. 903, 33 U.S.C. 466 et seq., has undertaken to protect not only interstate waters but also the tributaries thereof from pollution. While we do not place our decision on Federal statutes, we mention them to show that National policy buttresses South Carolina's.
 
 The Duke Case
 
 24
 Duke owned 954.2 acres of land along the Seneca, including 106.40 acres in its bed. The United States condemned 531.1 of them, excluding any portion of the bed but including 27.4 acres occupied by Duke's dam and reservoir. These units, plus a powerhouse, substation and transmission lines, together constituting the hydroelectric facilities, were entirely obliterated by the lake. Built in 1898 and located at Portman Shoals, they were 14 miles below Stevens' plant, 8 miles above the Savannah and 13 miles up from the Hartwell Dam.
 
 
 25
 The Commission's report, approved by the Court, allotted Duke $37,775 for the 503.7 acres exclusive of the dam and reservoir. Duke was also awarded $500,000 as the fair value of the hydroelectric facilities. The Government does not contest the computation or fairness of these figures, if as a matter of law the components are recoverable. The controversial point posed by the Government's brief is the allowance of any amount whatsoever for the productivity of the hydroelectric power, the predominant factor in the $500,000 judgment.
 
 
 26
 Here again the issue raised is the navigability of the Seneca. Duke asserts that its dam and reservoir are situated in nonnavigable waters, and that the Constitutional power of the United States to regulate navigation does not empower the Government, without making compensation, to take or destroy property not situate within navigable waters. The United States' opposing argument, aside from its basic assertion of the navigability of the entire Seneca, is two-fold. First, it is that the Commission and the District Court did not find the Seneca waters to be nonnavigable below Portman Shoals; that Duke's dam, at the foot of the Shoals, uses this section of the Seneca as a tail race; and that this dam is therefore within the Government's control over navigable waters. Secondly, the United States says that in any event the Seneca River is subject to the coutrol of the Government as a tributary, though nonnavigable, of the navigable Savannah, and that the United States took nothing from Duke when it abolished Duke's continued adaptation of the Seneca waters for the generation of electricity.
 
 
 27
 We accept the latter postulate, and so have no reason to consider the scope or correctness of the findings below in regard to the Seneca's navigability.
 
 
 28
 The Commerce Clause in its application to the waterways of the United States is not limited to the control of navigation. In United States v. Appalachian Power Co., supra, 311 U.S. 377, 426, 61 S.Ct. 291, 308 (1940), the comprehensiveness of the Constitutional provision was stated:
 
 
 29
 'In our view, it cannot properly be said that the constitutional power of the United States over its waters is limited to control for navigation. By navigation respondent means no more than operation of boats and improvement of the waterway itself. In truth the authority of the United States is the regulation of commerce on its waters. Navigability, in the sense just stated, is but a part of this whole. Flood protection, watershed development, recovery of the cost of improvements through utilization of power are likewise parts of commerce control.'
 
 
 30
 The Acts[4] authorizing the United States to expropriate the property and other rights included in these cases are predicated on this extensive power of control. That tributaries of navigable waters are within its comprehension is no longer debatable.
 
 
 31
 This is made quite plain in State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941). There the Constitutional prerogatives of the Government in respect to the control of inland waters in the advancement of interstate commerce are exhaustively examined. The enormous expansiveness of this power is described. Congress had authorized the construction in Oklahoma of a dam across the Red River, a nonnavigable tributary of the Mississippi River. The enterprise was held well within the power of the Federal Government to provide flood control and regulate navigation. The Court demonstrated the close relationship of the two, and made these pertinent observations:
 
 
 32
 'It is true that 'no part of the (Red) river within Oklahoma is navigable." (p. 523, 61 S.Ct. p. 1058) '* * * it is clear that Congress may exercise its control over the nonnavigable stretches of a river in order to preserve or promote commerce on the navigable portions.' (p. 523, 61 S.Ct. p. 1058) 'Congress was not unmindful of the effect of this project on the navigable capacity of the river.' (p. 523, S.Ct. p. 1058) 'There is no constitutional reason why Congress cannot, under the commerce power, treat the watersheds as a key to flood control on navigable streams and their tributaries.' (p. 525, 61 S.Ct. p. 1059) 'And we now add that the power of flood control extends to the tributaries of navigable streams. For, just as control over the non-navigable parts of a river may be essential or desirable in the interests of the navigable portions, so may the key to flood control on a navigable stream be found in whole or in part in flood control on its tributaries.' (p. 525-526, 61 S.Ct. pp. 1059-1060)
 
 
 33
 The pertinency of these words presently is underscored when we bear in mind that the Seneca and the Savannah are not different rivers. Although bearing different names they constitute a single waterway. Consequently, as just quoted, the Federal power of control over the Seneca may be justified as control over a nonnavigable stretch of the navigable Savannah. Some analogy may also be found in the facts of United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913) where the Government was accorded paramount rights in the nonnavigable falls and rapids in the St. Marys River, the outlet of Lake Superior's waters.
 
 
 34
 Furthermore, State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., supra, 313 U.S. 508, 61 S.Ct. 1050, held that the Government's determination that a particular project is needed to properly regulate navigation is conclusive. Thus we are not at liberty to inquire whether the Hartwell Dam and Reservoir was an appropriate exercise of Federal jurisdiction.
 
 
 35
 Here we are dealing only with the flow of the Seneca. Wherever the Government has submerged or otherwise deprived the proprietor of rights above the river's ordinary high-water mark, uncontested recompense has been made. The attack on the Duke award is concentrated upon its allowance for water power. This component is not compensable, we have said, and United States v. Grand River Dam Authority, 363 U.S. 229, 233, 80 S.Ct. 1134, 1137, 4 L.Ed.2d 1186 (1960), sustained this proposition in these words:
 
 
 36
 'When the United States appropriates the flow either of a navigable or a nonnavigable stream pursuant to its superior power under the Commerce Clause, it is exercising established prerogatives and is beholden to no one.'
 
 
 37
 This had in effect been the pronouncement of the Court in United States v. Willow River Power Co., 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945).
 
 
 38
 Undebatably, United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917), in the Kelly appeal No. 718, relied upon by Duke is a holding contrary to our conclusion here. There on the construction by the Government of a dam across a navigable river, water was backed up in an unnavigable tributary, thus raising its level above the ordinary high water mark of the tributary. The result was to destroy the power of a mill dam, essential to the value of the mill, by leaving only a noe foot drop over the crest of the mill dam. The owner was allowed compensation.
 
 
 39
 However, Cress on the Kelly appeal has been so severely pared as a precedent on the present point that we do not feel justified in allowing it to prevail here. Its scope was sharply straitened by United States v. Willow River Power Co., supra, 324 U.S. 499, 506, 65 S.Ct. 761; the diminution was noted in the dissent. Finally, Grand River, supra, 363 U.S. 229, 80 S.Ct. 1134, squarely refutes and rebukes the thought that Cress warrants recovery by Duke.[5]
 
 
 40
 The contention of Duke that Congress by statute, 33 U.S.C. 701c-1, has directed payment to duke for its facilities at portman shoals, we find without merit.
 
 
 41
 The judgments awarding compensation for the contested items in these cases will be reversed, and the actions remanded to the District Court for the entry of appropriate orders denying the present claims of Stevens and Duke.
 
 
 42
 Reversed and remanded.
 
 
 
 [1]
 Act of December 22, 1944, P.L. 534, 78th Congress, 58 Stat. 887; Act of May 17, 1950, P.L. 516, 81st Congress, 64 Stat. 163; Act of September 10, 1959, P.L. 86-254, 73 Stat. 491
 
 
 [2]
 Code of Laws of South Carolina, 1962, 70-101 et seq
 
 
 [3]
 70-131
 
 
 [4]
 See citations in footnote 1, supra
 
 
 [5]
 Authorities excluding flow in a navigable stream as an element of valuation in the condemnation of riparian properties are not cited because the questions in the instant cases are raised with specific reference to nonnavigable waters. For examples of such other authorities, see United States v. Virginia Electric & Power Co., 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961); United States v. Twin City Power Co., 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956)