**UNITED STATES of America**
v.
**CROW, POPE & LAND ENTER-PRISES, INC.**
**Civ. A. No. 15844.**

United States District Court
N. D. Georgia,
Atlanta Division.
March 21, 1972.

John W. Stokes, Jr., U. S. Atty., Atlanta, Ga., for plaintiff.

Moreton Rolleston, Jr., Atlanta, Ga., for defendant.

## ORDER

ALBERT J. HENDERSON, Jr., District Judge.

In this suit, the federal government seeks to enforce Sections 10 and 13 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. §§ 403 [1] and 407 [2] more commonly referred to as the "1899 Refuse Act", against the defendant, a real estate developer and apartment complex owner. Jurisdiction is founded on 28 U.S.C. § 1345.

By its answer, the defendant contends that 33 U.S.C. § 401 et seq., is inapplicable to the waters here involved; that the plaintiff's interpretation of the pertinent statutes would constitute an illegal and unconstitutional deprivation of the defendant's property without just and adequate compensation therefor; and that if allowed to proceed, the plaintiff's actions amount to an illegal attempt at selective enforcement. The defendant also brings what is denominated as a counterclaim against John W. Stokes, Jr., United States Attorney for the Northern District of Georgia, for trespass upon the defendant's property.

Prior to the hearing on the plaintiff's demand for preliminary injunction, the court entered a consent decree disposing of all matters pertaining to preliminary relief while reserving all issues of liability. Further, it was stipulated by the parties that the preliminary hearing would constitute the final hearing on the

---

1. § 403 provides:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same. Mar. 3, 1899, c. 425, § 10, 30 Stat. 1151.

2. § 407 provides:

It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water; and it shall not be lawful to deposit, or cause, suffer, or procure to be deposited material of any kind in any place on the bank of any navigable water, or on the bank of any tributary of any navigable water, where the same shall be liable to be washed into such navigable water, either by ordinary or high tides, or by storms or floods, or otherwise, whereby navigation shall or may be impeded or obstructed: Provided, That nothing herein contained shall extend to, apply to, or prohibit the operations in connection with the improvement of navigable waters or construction of public works, considered necessary and proper by the United States officers supervising such improvement or public work: And provided further, That the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material; and whenever any permit is so granted the conditions thereof shall be strictly complied with, and any violation thereof shall be unlawful. Mar. 3, 1899, c. 425, § 13, 30 Stat. 1152.

issue of navigability. This order is based on the evidence then presented and the stipulation of the parties thereafter submitted to the court.

The defendant's property, known as Riverbend, is located on the west bank of the Chattahoochee River and slightly south of Powers Ferry Bridge. When describing distances and locations on the Chattahoochee River, it is desirable to refer to their mileage from the confluence of the Chattahoochee and Flint Rivers as determined by the United States Army Corps of Engineers. Therefore, for ease of reference, the property in question is located at approximately mile 306 (understood to mean the distance from the juncture of the Chattahoochee and Flint Rivers). The segment of the Chattahoochee River relevant to the present inquiry is that portion between Peachtree Creek (mile 300.54) and Buford Dam (mile 348.82), *i. e.*, a distance of 47.78 miles. Located north of Buford Dam is the Buford Reservoir (or Lake Sidney Lanier), which, in a different context (admiralty), has previously been determined to be non-navigable, see, In Re Henry H. Stephens, 341 F.Supp. 1404, Civil Action No. 8749 (N.D.Ga. March 31, 1965).[3] Consequently, since the navigability of the river below Peachtree Creek will not be considered in this order, it is an evidentiary question as to where along the course of the river between its mouth and its source navigability ceases. United States v. Rio Grande Dam and Irrig. Co., 174 U.S. 690, 19 S. Ct. 770, 43 L.Ed. 1136 (1899).

Following a hearing on the stipulated issue of navigability, counsel for each party was directed to submit written arguments, proposed findings of fact and conclusions of law. The parties have complied with that direction and the case is ready for decision.

The court has reviewed the admissible evidence presented by the parties hereto and makes the following:

## FINDINGS OF FACT

1. The Chattahoochee River (hereinafter sometimes referred to as the "river") is an interstate waterway over 400 miles in length running in a generally southwesterly direction from its source in northeast Georgia, to the Georgia-Alabama state lines where it bends to a generally southerly direction. In the southwest corner of the state, it unites with the Flint River to form the Apalachicola River, which, in slightly more than 100 miles, crosses the Florida panhandle to empty into the Gulf of Mexico. Specific locations along the Chattahoochee River are stated in miles from a specific point of reference determined to be the confluence of the Chattahoochee and Flint Rivers.

2. The defendant's property is located at approximately mile 306 on the river. The river near the defendant's property is quite shallow and the current is swift. Peachtree Creek, Morgan Falls Dam and Buford Dam are locted at miles 300.54, 312.62 and 348.82 respectively.

3. Columbus, Georgia (mile 170.7) was the head of steamboat navigation in the early 1800's, and bateaux (flat bottomed boats) could carry 70 bales of cotton from Franklin, Georgia (mile 239.9) to West Point, Georgia (mile 201.4). No other commercial craft has ever navigated the river above Columbus.

4. In the 1890's, a gold dredging, flat bottom, barge operated for three to five years on the river adjoining the barge owner's property in what is now Fulton and Gwinnett Counties. Around the turn of the century, raft-type ferries would traverse the river at several points. The barge and the ferries would use

---

3. Judge Hooper also discussed the portion of the river here involved and found that "[t]he Chattahoochee River is not in fact a 'continuously navigable water' except at a point many miles south of Lake Lanier. It is not navigable at all north of Lake Lanier, nor south of Lake Lanier until it reaches Columbus, Georgia.

"There is no navigation above Lake Lanier to the north, nor any navigation from the lake in a southerly direction where the dam is located. The river is not navigable below the dam. There are, however, comparatively short stretches in the river above and below the dam which might be called navigable."

poles, ropes and the current as their means of locomotion, and would draw no more than two feet of water.

5. Evidence of farmers and moonshiners using the river to transport their wares is scant, and, if true, appears without specificity as to location and frequency.

6. Presently, only light pleasure craft, *e. g.*, canoes, kayaks, rubber innertubes and rafts, drawing only a few inches of water, can and do float down the river.

7. No craft of any kind has ever proceeded upstream due to the rapid current and frequent obstructions.

8. The topography of the river and surrounding property reveals a hill bound region between Roswell, Georgia (mile 323.7) and Atlanta (mile 306.2) with perpendicular rock cliffs on both sides of the water. The fall is very great, the current is rapid, and the channel is filled with projecting rock. The river alternately expands and contracts and follows a generally winding course through what remains a greatly wooded territory.

9. There are an unknown number of rapids, shoals or similar obstructions in the area here concerned. However, taken from the original 1878 and 1879 surveys and studies of the river by the Corps of Engineers, there are below what is now Buford Dam at least 18 areas of shoals and/or reefs some of which are up to two miles in length with a fall ranging from a gentle 0.30 foot to 19.95 feet. Between Roswell and Atlanta the fall averages 5.7 feet per mile.

10. The gradient of the river between those areas of interference appears to be rather uniform and regular.

11. The only admissible evidence as to the quantity of water involved, indicates that peak flows are of short duration while minimum flows are of longer duration. In addition, the release of water from Buford Dam significantly alters the water flow at different times of the week.

12. The United States Army Corps of Engineers consider a channel at least 100 feet wide, nine feet deep, with locks 50 feet wide as sufficient to accommodate and sustain useful commerce. These dimensional prerequisites obtain on the river from its confluence with the Flint River up to Columbus where a project depth of three feet is authorized to Franklin, Georgia. Locks of at least 50 feet in width exist at the Jim Woodruff Lock and Dam (mile 0.0), the Columbia Lock and Dam (mile 46.5), and the Walter F. George Lock and Dam (mile 75.2).

13. The West Point Dam (under construction 30 miles south of Franklin, Georgia), the Morgan Falls Dam and the Buford Dam do not have locks which would permit through navigation by any vessel.

14. There is no evidence, admissible or inadmissible, that matter or refuse placed in the Chattahoochee River would float or be washed downstream to any other portion of the river.

15. The Georgia Legislature, by enactments approved in 1820, 1826, 1835 and 1852, indicated its desire to improve the navigability of the Chattahoochee River. No findings were ever reported following the implementation of this legislation, nor is there any indication of the work actually performed.

16. It is the conclusion of the Corps of Engineers, based upon the 1878 and 1879 surveys of the river between Thompson's Bridge (Gainesville, Georgia) and the Western and Atlantic Railroad crossing (Atlanta, Georgia) that the section ". . . was susceptible of ready improvibility [sic] at a reasonable cost to accommodate vessels normal to the river at that time."

17. The Annual Report of the Chief of Engineers for 1880, as adopted by the Corps of Engineers on January 12, 1972, states that the needed improvements for a channel *80 feet wide and three feet deep* between Gainsville and Atlanta would require *either* 12 locks and dams, with an average lift of 12 feet, *seven of which will be between Roswell and Atlanta, or* 28 locks, with seven to 16 feet

in lift, averaging 11 feet, at an approximate 1880 cost of $1,523,655.00. No adjustment has been made by the recent report to account for the subsequent construction of Buford and Morgan Falls Dams. The 1880 monetary estimate is based primarily upon the needed improvements being constructed from locally available timber. No evidence was offered to reflect the present cost of improvements required by the report.

18. Citing as the need for the stated improvements, the Corps of Engineers, in the 1880 Report and adopted in January, 1972, stressed the following:

> Above Atlanta the counties north of the river are without transportation, except by wagonroads. The improvement of the river would afford a cheap and certain means of getting to market a large and very rich agricultural section. The great gold region lies upon the waters of this stream and around the head of the proposed improvement. Much of this country is rich in magnetic iron ore and other minerals of great value.

19. While no other evidence was presented as to the present need of the Atlanta area for such an additional avenue of commerce, the court can and does take judicial notice of the recent population and economic growth adjoining the river at and around the greater metropolitan Atlanta area.

20. The United States Attorney for the Northern District of Georgia, John W. Stokes, Jr., did, on or about November 1, 1971, ride down the Chattahoochee River in a canoe, and did proceed along the west bank of the river south of Powers Ferry Bridge.

## DISCUSSION

As previously stated, the sole question to be adjudicated in this order is whether the Chattahoochee River is navigable between Peachtree Creek and Buford Dam. Support for considering a section of the river is found in United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940), wherein the Court independently and separately reviewed the lower court's findings as to a middle segment of the New River apart from and irrespective of the Court's observation that adjoining portions of the New River were clearly navigable. Consequently, this court will consider a segment of the Chattahoochee River approximately 47 miles in length without regard to the navigability of the river at any other point. In addition, the court is limited in its findings to the facts presented by the parties hereto, since there is no relevant prior holding of which the court could take judicial notice.

It is perhaps appropriate at this stage of the proceedings to make an observation concerning the sufficiency of the evidence presented. The court, in its research of the subject area has reviewed numerous decisions of the United States Supreme Court, as well as a multitude of lower federal rulings, which have held various waterways of the United States to be either navigable or non-navigable. Even a cursory reading of the evidence upon which these decisions were based reveals the frequently astounding amount of factual information, expert testimony and historical data ordinarily recited in support of the court's findings. However, in the case at bar, either because such evidence does not exist, or because the parties did not deem it advisable to proffer that information, the court has found itself in the uncomfortable position of having to rule on a significant question of law and fact without the quality and quantity of evidence cited by other tribunals in their determinations. Therefore, the present holding is necessarily limited to the scant factual evidence submitted by the parties, and, as will be hereinafter discussed, without the requisite evidentiary bases necessary to sustain the burden of proof.

In discussing the question of navigability, it is important to note the landmark decision in The Daniel Ball, 10 Wall. 557, 19 L.Ed. 999 (1890), which, in rejecting the English tide-water test

as appropriate for this country, announced the following guidelines:

Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the Acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted on water.

*Id.*, at 563, 19 L.Ed. 999. By way of further clarification and as a further refinement of the test laid down in *The Daniel Ball*, the Court stated that,

. . . the true test does not depend on the mode by which commerce is, or may be, conducted, nor the difficulties attending navigation. . . .

The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of the river, rather than the extent and manner of that use.

The Montello, 20 Wall. 430, 441, 22 L.Ed. 391 (1874). The Court also for the first time recognized that obstructions rendering navigation difficult would not defeat a finding of navigability where commerce was nevertheless successfully being conducted. *Id.*, at 442, 22 L.Ed. 391. These and related principles have been repeated many times in later Supreme Court decisions, see, *e. g.*, Packer v. Bird, 137 U.S. 661, 11 S.Ct. 210, 34 L.Ed. 819 (1891); United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L. Ed. 746 (1917); United States v. Holt

State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926); United States v. Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 (1931), and with a few variations and modifications remain the true test today.

▮ The mere fact that a river will occasionally float logs, poles and rafts downstream in times of high water does not make the river navigable. United States v. Rio Grande Dam & Irrig. Co., *supra*, and,

[i]t is not, however, as Chief Justice Shaw said (Rowe v. [Granite] Bridge Co., 21 Pick., 344), "every small creek in which a fishing skiff or gunning canoe can be made to float at high water, which is deemed navigable, but, in order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture."

*The Montello, supra,* 20 Wall. at 442, 22 L.Ed. 391. Instead, with one exception, the principle that a river is navigable when it is used or is susceptible for use in its ordinary condition as a highway of commerce has been consistently followed by the federal courts. That exception is Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914 (1900), where the Court, in reviewing a criminal conviction under the predecessor statute to 33 U.S.C. § 401, more narrowly defined the term "navigable waters of the United States", to include only those waters where commerce is of a "substantial and permanent character". *Id.*, at 632, 20 S.Ct. 797, at 801, 44 L.Ed. 914. Therefore, the waterway must be susceptible for use as a channel of useful commerce and not merely capable of exceptional transportation during periods of high water. Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 43 S. Ct. 60, 67 L.Ed. 140 (1922).

▮ Since *Montello*, it is conceded that the existence of occasional obstructions will not deprive a river of its navigable status, and a river need not be open for commercial navigation at all seasons of the year or at all stages of

the water. See, Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921) (under the 1899 Refuse Act); St. Anthony Falls Water Power Co. v. St. Paul Water Commissioners, 168 U.S. 349, 18 S.Ct. 157, 42 L.Ed. 497 (1897). The river must have the capacity in its natural state for carrying interstate commerce. The fact that artificial, as opposed to natural, obstructions may exist does not prevent navigability, when such obstructions are capable of abatement by the due exercise of public authority, and where supposing them to be abated, the river would be navigable in fact in its natural state. See, Economy Light & Power Co. v. United States, *supra,* 256 U.S. at 118, 41 S. Ct. 409, 65 L.Ed. 847.

 The Supreme Court, in *Economy Light, supra,* also rejected the contention that a river once found to be navigable can be deprived of that status through commercial disuse for a period of time. If, because of changed conditions, either geographic or economic, the usefulness of a river as a means of transportation has lessened, the river's navigability status remains unchanged pending an official abandonment by Congress. *Id.,* at 124, 41 S.Ct. 409, 65 L.Ed. 847; Arizona v. California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154 (1931). As applied to the case at bar, if the river ever was navigable within the tests previously and hereinafter discussed, then it must remain so today.

 In recent years, the most significant and definitive ruling by the Supreme Court on the question of navigability was stated in United States v. Appalachian Electric Power Co., *supra.* The suit was brought by the United States to enjoin the construction and maintenance of a proposed dam without first having obtained a license from the Federal Power Commission pursuant to Section 23 of the Federal Water Power Act of 1920, 16 U.S.C. § 816, and for further violations of Sections 9 and 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401 and 403. As Mr. Justice Roberts noted in the dissenting opinion, the Court by its holding, added two additional tests to the uniform current of authority. First, as used in previous decisions of the Court, the phrase "natural and ordinary conditions" see, United States v. Oregon, 295 U.S. 1, 15, 55 S.Ct. 610, 79 L.Ed. 1267 (1935), was held to mean only volume of water, gradient and regularity of flow. Secondly, the Court held that even where a stream is not passable in its natural and ordinary condition, if, by "reasonable" improvements it may be rendered navigable, then the stream is navigable without such improvement. *Id.,* 311 U.S. at 432–433, 61 S.Ct. 291, 85 L.Ed. 243. Making a determination of what is reasonable, by necessity, requires a balance " . . . between cost and need at a time when the improvement would be useful." *Id.,* at 407–408, 61 S.Ct. at 299.

Since those improvements, however, need not be completed or even authorized, the court looked to whether the New River could be used for interstate commerce when and if reasonable improvements were ever made. In addition, the Court reviewed the substantial prior use of the selected 59-mile stretch, and concluded that the river was a navigable waterway of the United States.

 As it relates to the present dispute, the court is not unmindful of the difference between suits brought to fix the rights of riparian owners, those concerned with the determination of admiralty jurisdiction, Art. III, § 2, cl. 1 of the U.S.Const., and the scope of Congress' regulatory power over navigable waters under the "commerce clause", Art. I, § 8, cl. 3. The expansiveness of the latter power is amply demonstrated by reading Oklahoma ex rel. Phillips v. Guy F. Atkinson, Co., 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941); and Arizona v. California, *supra.* However, to forestall any conclusion that improvements broaden the constitutional power over commerce, the Supreme Court stated:

[i]t cannot properly be said that the federal [commerce] power over navigation is enlarged by the improve-

ments to the waterways. It is merely that improvements make applicable to certain waterways the existing power over commerce.

United States v. Appalachian Electric Power Co., *supra,* 311 U.S. at 409, 61 S.Ct. at 300; see, United States v. Cress, *supra.*

██ ██ Accordingly, the court does not here dispute the authority of Congress to legislate the expropriation of property along a non-navigable tributary which affects a clearly navigable river of the kind and character discussed in United States v. 531.13 Acres of Land, Etc., 366 F.2d 915 (4th Cir. 1966). Nor can the court's conclusion be denied that Congress may exercise control over non-navigable stretches of a river in order to promote or protect commerce on the navigable portions. *Id.,* at 921, citing Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., *supra.* Clearly, that was the intent of the 1899 Refuse Act when it forbade the deposit of refuse matter " . . . into any tributary of any navigable water from which the same shall float or be washed into such navigable water." 33 U.S.C. § 407. However, as stated several times in this order, the government presented no evidence that what is deposited in the river by the defendant will float or be washed downstream to any other segment of the river, and has specifically disavowed any intent to rely upon the so-called "tributary theory" under the Act. Instead, the plaintiff contends solely that the river adjoining the defendant's property is navigable.

██ With due regard to the liberality frequently accorded the federal regulatory powers, the court notes the well reasoned analysis and summarization of the *"Appalachian* guidelines" in Rochester Gas and Electric Corp. v. Federal Power Comm., 344 F.2d 594 (2nd Cir. 1965), cert. denied, 382 U.S. 832, 86 S.Ct. 72, 15 L.Ed.2d 75 (1965), wherein the following threefold test of navigability was deduced,

. . . if (1) it *presently* is being used or is suitable for use, or (2) it has been used or was suitable for use in the *past,* or (3) it could be made suitable for use in the *future* by reasonable improvements. (emphasis added).

*Id.,* 344 F.2d at 596. This synopsis of *Appalachian* has been cited with approval and followed by the courts in Marine Stevedoring Corp. v. Oosting, 398 F.2d 900, 908 (4th Cir. 1968) reversed on other grounds, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969); Spiller v. Thomas M. Lowe and Assoc., Inc., 328 F. Supp. 54, 60 (W.D.Ark.1971); Pitship Duck Club v. Town of Sequim, 315 F. Supp. 309, 310 (W.D.Wash.1970); Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238, 252 (M.D.Pa. 1970); C. J. Montag and Sons, Inc. v. O'Leary, 304 F.Supp. 188, 189 (D.Ore. 1969), and, because of its obvious relevance to the present dispute, will guide further consideration of the Chattahoochee River.

██ No meaningful argument can be made that the Chattahoochee River is *presently* being used or is susceptible for commercial navigation. The uncontradicted testimony clearly reveals that current boat travel on the river is limited to very light sporting craft such as canoes, kayaks and rubber rafts, drawing no more than a few inches of water, and that even these floating devices often scrape the rocky bed of the river. While pleasure boating can sometimes indicate a river's susceptibility for commercial use, see, United States v. Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844, the type of craft and persons presently using, and enjoying, the river demonstrates that the river's main appeal lies in the frequent excitement one encounters in "running the rapids", observing the "white water", and having short interims of "good water" upon which to relax. It would be an affront to the public's intelligence to classify the river *presently* suitable for any kind of commercial navigation.

A closer question exists when discussing whether the river has been used or was suitable for commercial use in the *past*. With the exception of the gold dredging barge, and two or three ferries operating upon the river, the government has shown no other prior use of the river in the subject section. Even though a small amount of traffic compared to the available commerce of the region is sufficient, United States v. Appalachian Electric Power Co., *supra,* the existence of ferries is no more an example of commercial use than the presence of a bridge or railroad trestle whose primary purpose is to avoid the river rather than to employ it as a means for trade and transportation. Rochester Gas and Electric Corp. v. Federal Power Comm., *supra.* Similarly, the barge is but an isolated and exceptional example of a person using the river for a few miles primarily along his own property, to extract gold-bearing silt from the river bed. While there are cases in which a slightly more substantial history of commercial use has failed to result in a finding of navigability, see, United States v. Oregon, *supra;* United States v. Rio Grande Dam and Irrig. Co., *supra;* Brewer-Elliott Oil and Gas Co. v. United States, *supra;* Oklahoma v. Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771 (1922), no case known to the court has gone so far as to hold that one verified example, such as we have here, is sufficient to demonstrate navigability under law. *cf.,* George v. Beavark, Inc., 402 F.2d 977 (8th Cir. 1968). Consequently, the stretch of the river presently under consideration was neither used nor susceptible for use as a highway of commerce in the *past.*

Finally, the court must decide whether the river could be made suitable for use in the *future* by reasonable improvements. In this regard, the January 12, 1972, determination of the Corps of Engineers is offered by the government as proof that the river can reasonably be improved. However, as noted previously in this order, the most recent interagency memorandum of the Corps of Engineers is founded upon certain findings collected by surveys and studies performed in 1878 and 1879, and published in Part II, Annual Report of the Chief of Engineers for 1880, Ex.Doc. I, Part 2, Volume II, 46th Congress, 3d Session. While the court holds serious doubts as the correctness of those recommendations today in light of subsequent reports issued and published by the Corps, see, Report of Chief of Engineers, 1962, Document No. 570, 87th Congress, 2d Session, and Report of Chief of Engineers, 1939, House Document No. 342, 76th Congress, 1st Session, since the 1972 determination adopts the findings and recommendations of the 1880 Report, the latter provides the only evidentiary matter which the court may consider on the question of necessary improvements.

In light of the Supreme Court's admonition in *Appalachian* that a determination of what constitutes reasonable improvements will depend upon a balancing of cost and need at a time when the improvement would be useful, the court notes and rejects the Corps' legal conclusion that the river is navigable today because it could have been made navigable in 1880. In other words, recognizing that the river in 1880 was not susceptible to commercial transportation, the Corps is attempting to engraft the "future improvement" criterion upon the test of past susceptibility. Clearly, the question, properly phrased, is whether a presently non-navigable river can be made navigable in the future through the implementation of reasonable improvements. The issue is *not,* as the Corps of Engineers apparently believes, whether at some time in the past the river could have been sufficiently improved to meet the then needs of the area. The court is without evidence as to the present need of the Atlanta area for such an avenue of commerce, and, similarly, has no knowledge as to how much it would cost to make the river available for commercial traffic. Absent a more thorough showing of these two crucial factors, the court cannot balance the opposing inter-

ests involved in accordance with the mandate of the Supreme Court.

■ In addition, the court is unable to determine whether the natural and ordinary condition of the river, *i. e.,* volume of water, gradient, and regularity of flow, is capable of supporting navigation since that information, with the exception of a few generalities, has not been presented. The data the court was able to extract from the various reports of the Corps of Engineers, especially the 1880 Report, show that between Peachtree Creek and Buford Dam, the stretches of "good water" are infrequent, and that a considerable number of dams and locks would be necessary to make the river passable by craft normal at this time. Without the guidance of experts in the field, the court cannot independently take judicial notice that improvements, of unknown cost, would be reasonable.

■ In summary, the court has reviewed the testimony of the witnesses for the plaintiff, as well as all the reports and exhibits offered to support a finding of navigability. Under the law as it now exists, the evidence does not meet the necessary minimal requirements found sufficient by other judicial tribunals. As much as the court sympathizes with the obvious and worthwhile purpose underlying the institution of this action, the application of common sense to the facts presented herein demands a finding that the Chattahoochee River between Peachtree Creek and Buford Dam is not a navigable water of the United States.

Because the defendant's counterclaim is clearly without merit, little need be said in granting the motion to dismiss, other than to recite and restate the grounds therefor.

■ First, because John W. Stokes, Jr., is not a party to the original action, no counterclaim could be asserted against him as an "individual". See Introductory Paragraph to Defendant's Counterclaim. Second, if the defendant desires to make Stokes a third-party de-

fendant, pursuant to Rule 14 of the Federal Rules of Civil Procedure, then he must be served with a summons and complaint, a fact which does not here exist. Fed.R.Civ.P. 14(a). Third, it conclusively appears that Stokes could not be liable to the defendant for all or part of the plaintiff's claim against him, as required by Rule 14(a), and, therefore, could not be a third-party defendant even if properly served. Cook & Nichol, Inc. v. Plimsoll Club, 451 F.2d 505 (5th Cir. 1971). Finally, since John Stokes is not a party to the original suit, and in view of the fact that the claim is purely one of state law, the court lacks both jurisdiction over the person and the subject matter of the defendant's claim.

Therefore, the motion to dismiss the defendant's counterclaim is meritorious.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of this action pursuant to 33 U.S.C. §§ 403 and 407; 28 U.S.C. § 1345.

2. The Chattahoochee River between Peachtree Creek and Buford Dam is not a navigable water of the United States within the meaning of 33 U.S.C. §§ 403 and 407, and, therefore, the defendant, Crow, Pope & Land Enterprises, Inc., is not subject to the provisions of those statutes.

■ 3. Since there exists no evidence that what the defendant is depositing in the subject section of the river will either float or be washed downstream to a navigable portion of the river, the plaintiff's claim upon the "tributary theory" is without merit, and is hereby rejected. The defendant, therefore, is not liable under the tributary provisions of 33 U.S.C. § 407.

4. Because the defendant's individual claim against John W. Stokes, Jr., is improper under both Rules 13 and 14 of the Federal Rules of Civil Procedure, the motion of the plaintiff to dismiss the counterclaim of the defendant is, accordingly, granted.

To the extent that any findings of fact set forth in this order are deemed to be conclusions of law, or to the extent that any of the foregoing conclusions of law are deemed to be findings of fact, the same shall be deemed conclusions of law or findings of fact as the case may be.

Let judgment issue accordingly.