John H. BOONE, Esq., Trustee of the Maud Van Cortland Hill Schroll Trust, Plaintiff,

v.

UNITED STATES of America; Department of the Army; United States Corps of Engineers; John O. Marsh, Jr., Secretary of the Army; Lieutenant General Henry J. Hatch, Chief of Engineers, Corps of Engineers, U.S. Army; Brigadier General Arthur E. Williams, Division Engineer, Pacific Ocean Division, Corps of Engineers, U.S. Army; Colonel F.W. Wanner, District Engineer, Honolulu District Corps of Engineers, U.S. Army, Defendants.

UNITED STATES of America, Counterclaim Plaintiff,

v.

John H. BOONE, Esq., Trustee of the Maud Van Cortland Hill Schroll Trust, Counterclaim Defendant.

Civ. No. 88–00462 DAE.

United States District Court, D. Hawaii.

March 16, 1990.

Diane D. Hastert, Damon Key Bocken Leong Kupchak, Honolulu, Hawaii, for plaintiff.

Stephen Samuels, Environmental Defense Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO ALTER OR AMEND THE JUDGMENT, AND DENYING PLAINTIFF'S MOTION FOR SANCTIONS

DAVID A. EZRA, District Judge.

On November 27, 1989, this court entered its findings of fact, conclusions of law and decision in the above captioned matter. *Boone v. United States*, 725 F.Supp. 1509 (D.Haw.1989). In granting judgment for the plaintiff, the court concluded that Pūkóo fishpond had been private property prior to its construction into what is now Pukoo Lagoon and remains private property today. The court also declared that Pukoo Lagoon is not subject to a navigational servitude requiring general public access.

On December 8, 1989, defendant and counterclaim plaintiff United States of America ("the government") moved this court, pursuant to Fed.R.Civ.P. 59(e), to alter or amend the judgment in this matter. The plaintiff has filed its response and has moved for sanctions pursuant to Fed.R. Civ.P. 11.

■ In its motion, the government seeks to have this court amend its findings of fact and conclusions of law in addition to altering the declaratory judgment that this court rendered in this matter. Fed.R. Civ.P. 59(e) provides that "[a] motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment," and does not provide a mechanism for the government to move for an amendment of this court's findings and conclusions. The government should have moved this court under Fed.R.Civ.P. 52(b) which provides that

> [u]pon motion of a party made not later than 10 days after entry of judgment, the court may amend its findings or make additional findings and may amend the judgment accordingly. The motion may be made with a motion for a new trial pursuant to Rule 59. When findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support

the findings may thereafter be raised whether or not the party raising the question has made in the district court an objection to such findings or has made a motion to amend them or a motion for judgment.

Because the government filed its instant motion within the ten day time limit required by both Rule 59(e) and Rule 52(b), the court will, however, construe the government's motion as incorporating a motion pursuant to Fed.R.Civ.P. 52(b). *United States v. 1982 Sanger 24' Spectra Boat*, 738 F.2d 1043, 1046 (9th Cir.1984); *Hutches v. Renfroe* 200 F.2d 337, 341 (5th Cir.1952); 6A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 59.12[1] (2d ed. 1985). To limit the government's motion to the strict language of Rule 59(e), although within this court's discretion, would impose a draconian result which this court believes the drafters of the Federal Rules of Civil Procedure did not intend.

The court has carefully considered the parties' memoranda and the arguments raised therein. For the reasons set forth below, the court denies in part and grants in part the government's motion, and denies plaintiff's motion for sanctions.

## DISCUSSION

As a preliminary matter, the court notes that the government does not suggest the existence of new evidence that was not, or could not have been presented during the trial of this matter, but rather is attempting, through this motion, to challenge each of the factual findings made by the court as "contrary to the clear weight of the evidence presented at trial." Government's Memorandum at 1. Additionally, the government asserts, without presenting any arguments that it could not have presented at trial, that the court's legal conclusions are erroneous and should be amended as well. Government's Memorandum at 2. In short, through this motion the government seeks to relitigate this matter and have the court reverse its findings and conclusions on virtually every major point of contention.

Plaintiff has cited *Leong v. Hilton Hotels Corp.*, 689 F.Supp. 1572, 1573 (D.Haw. 1988) for the proposition that a Rule 59(e) motion should be denied unless the movant raises an intervening development of law or presents new evidence that was previously unavailable, or demonstrates that the prior order is clear error. Both *Leong* and the case upon which *Leong* draws support, *All Hawaii Tours v. Polynesian Cultural Center*, 116 F.R.D. 645 (D.Haw.1987), *aff'd in part, rev'd in part on other grounds*, (text of unpublished Ninth Circuit opinion available only on LEXIS and WESTLAW), discuss the standard by which the court should treat a Rule 59(e) motion for reconsideration and are the law of this district.

■ In this circuit, a motion for reconsideration may be brought on the basis of judicial mistakes, as well as mistakes of a party or his counsel. *Liberty Mutual Insurance Co. v. E.E.O.C.*, 691 F.2d 438, 441 (9th Cir.1982). However, a motion for reconsideration that presents no arguments that have not already been raised at trial should be denied. *Cf. Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir.1985).

■ Although the government has not met the requirements set forth in *Leong* and *All Hawaii Tours* in order to proceed with its motion for reconsideration,[1] this court, in deference to the arguments raised by the government, will address, or per-

haps more accurately stated readdress, the most critical of the government's contentions raised in the instant motion.[2]

## I. THE NAVIGABILITY OF PŪKÓO POND

### A. The Government's Five Factual Witnesses

In challenging the court's finding that the predevelopment Pūkóo fishpond was not navigable in fact, the government asserts that the court did not adequately consider the testimony of the government's five fact witnesses on the issue of whether it was possible to navigate a boat over and across the fishpond wall.

This court carefully evaluated the testimony of each of those witnesses and weighed their demeanor and credibility (including any apparent motive or bias)— items which cannot be discerned simply by reading a transcript of the trial. The court found, and continues to believe, that the testimony of these government witnesses was inconsistent and not as credible as the testimony of plaintiff's witnesses on this issue.

■ In its motion the government points to the testimony of William Kamakeeaina as an example of testimony to which the court should have given greater credence.

**1.** The court concludes that the law of other circuits would also permit this court to summarily dispense with the government's motion because it does not present any new evidence or arguments. *See Chastain v. Kelley*, 510 F.2d 1232, 1238 n. 7 (D.C.Cir.1975) ("[i]t is not as clear as the [g]overnment seems to have assumed that a movant under Rule 59(e) may seek to 'alter or amend' a judgment simply because it was erroneous"); *Milwee v. Peachtree Cypress Inv. Co.*, 510 F.Supp. 284, 289 (E.D.Tenn.1979), *aff'd*, 644 F.2d 885 (6th Cir.1981) ("rules are not intended to be utilized to relitigate old matters"); *Durkin v. Taylor*, 444 F.Supp. 879 (E.D. Va.1977) ("[s]ince the plaintiff has brought up nothing new ... [the court] has no proper basis upon which to alter or amend the order previously entered"); *Frito-Lay of Puerto Rico, Inc v. Cañas*, 92 F.R.D. 384, 390 (D.P.R.1981) (Rule 59(e) not intended "to give an unhappy litigant one additional chance to sway the judge." (quoting *Durkin v. Taylor*)); *Erickson Tool Co. v. Balas Collet Co.*, 277 F.Supp. 226, 234 (N.D.Ohio 1967), *aff'd*, 404 F.2d 35 (6th Cir.1968) ("com-

plete reversal of the [c]ourt's judgment" is not the purpose of Rule 59(e)).

Although decisions by other courts indicate that the drafters of the Federal Rules of Civil Procedure did not intend such a wholesale review of a trial court's decision and the evidence in support thereof, the court finds that a literal reading of Rule 52(b) (as this court incorporated into the government's Rule 59(e) motion) does permit a review by this court in the exercise of its discretion of any of its findings and conclusions.

**2.** Because the government challenges findings and conclusions that are central to the court's ultimate decision in this matter, the court concludes that its action in this instant order is consistent with the Eastern District of California's holding in *Davis v. Mathews*, 450 F.Supp. 308, 318 (E.D.Cal.1978) with respect to the treatment of Rule 52(b) motions, although ·the end result is nearly equivalent to a retrial of the action.

The court did not specifically comment on this witness's testimony in its opinion.

Mr. Kamakeeaina had served as the caretaker of Pūkóo fishpond in 1969, but did not appear to be as familiar with the fishpond as some of the other witnesses presented by both the government and the plaintiff. For example, Mr. Kamakeeaina was apparently unaware, until he became the caretaker, that the fishpond was considered private property, although this fact was well known to the other government witnesses. 6/28 Tr. at 201.

Additionally, Mr. Kamakeeaina's testimony appeared confused and not very informative as to whether or how those he allegedly observed fishing within the pond had traversed the fishpond wall, a critical issue in this matter. At one point in his testimony, when government's counsel asked whether he observed fishermen as they came into the fishpond with their boats, he stated "Well, I see them in there, but I never bother." 6/28 Tr. at 183. Later, when asked how the boats came inside the fishpond at low tide, he responded "I forgot, because, you know, when you're busy looking for fish, you know, you're busy. You no [sic] concentrate on the boats, how they got in. But they was [sic] in." 6/28 Tr. at 184. Accordingly, the court gave little weight to Mr. Kamakeeaina's testimony on the central issue of whether those entering the fishpond needed poles or planks to assist them in their traversing of the fishpond wall, and whether the pre-development Pūkóo fishpond was navigable in fact.

The court has again carefully reviewed the testimony of the other fact witnesses presented by the government and concludes, as before, that the testimony of these witnesses was neither consistent nor wholly credible. Their testimony varied as to where fishermen were alleged to have entered the fishpond, and what means they used in crossing over the fishpond wall.

In contrast, the court found the testimony that the fishpond wall presented a substantial barrier to navigation from the ocean, as presented by three disinterested witnesses, Alexander Brodie, Captain, U.S. Coast Guard Reserve, Richard Grigg, Ph.D. and Mrs. Laura Duvauchelle Smith, was consistent in terms of the relevant and critical facts, and was supported by other credible evidence presented at trial.

The court does not accept the government's argument that the admitted inconsistencies within the testimony of its five fact witnesses reflect the state of disrepair of the fishpond wall rather than the credibility of their testimony. This position is not supported by other credible evidence in this case.

In weighing the clearly conflicting testimony on this question, the court found plaintiff's witnesses clearly more believable in light of the other substantial evidence the court considered. Nothing that the government has presented convinces this court that it should alter its determination of this issue.

*B. The Court's Consideration of the Testimony of the Photographic Experts—the Government's Photogrammetric Technician and Plaintiff's Photogrammetric Engineer*

The government also contends that this court gave insufficient credit to the testimony of the government's expert, photogrammetric technician Gregory Ziebarth, and gave too much credit to the testimony of plaintiff's expert, photogrammetric engineer Gerald Salsig.[3]

The court does not find the government's contention persuasive. As to the testimony of these experts, the court found that plaintiff's expert rendered Ziebarth's testimony substantially nugatory. As Salsig clearly testified, based upon the aerial photographs they both examined, the state of the art in photogrammetric analysis precluded anyone, including Ziebarth, from concluding that the fishpond wall was underwater, or that the depth of the water

---

3. As established through Mr. Salsig's testimony and not successfully challenged by the government, photogrammetric technicians usually are supervised by, and have less training than, photogrammetric engineers.

within the fishpond was measurable with any degree of meaningful certainty.

Salsig also testified, and the court concluded, that Ziebarth's opinion was further flawed by his failure to properly take into consideration wave, wind and capillary action when he determined the level of the water at the fishpond wall. The court also found persuasive Salsig's testimony that because of refraction by water, the wall would appear disjointed in the 1961 photograph he examined, and that in his observation, the "center line of the wall represents a fairly continuous line." 6/22 Tr. at 57. The court notes that the government's expert never discussed, and to this court's knowledge, did not consider the impact of refraction upon the photographs he examined.

### C. The Interpretation of the Aerial Photographs

 The government would also have this court view with unaided eyes several of the aerial photographs in evidence and concur with the opinion of government's counsel that the photographs clearly show that the wall separating Pūkóo fishpond from the open sea was underwater, at least in part.[4] In addition, the government suggests the court should conclude from these photographs that the water at the locations at which the wall was alleged to have been underwater was of sufficient depth so as to permit navigation over the wall into the fishpond. In short, the government asks the court to determine from a layman's viewing of these photographs that the fishpond was navigable in fact.

This court heard and weighed the expert testimony regarding these aerial photographs, and after reexamining the evidence in light of the government's present motion finds no reason to alter its prior conclusion

that the pre-development Pūkóo fishpond was not navigable in fact.

## II. THE SCOPE OF THE 1971 PERMIT

The government next contends that the court's finding by a preponderance of the evidence that the United States Army Corps of Engineers' ("the Corps") permit issued in 1971 did not authorize the dredging or filling work within Pūkóo fishpond is contrary to the clear weight of the evidence. The court notes that the government goes to great lengths to have the court reconsider its evidence which the government asserts clearly shows that "the dredging and filling of fishpond were part of the work for which authorization from the Corps was sought." Government's Motion for Reconsideration at 32. The government suggests that the court's findings with respect to the scope of the work covered by the 1971 permit "are based upon an incomplete consideration of the record." *Id.*

 The government appears to be under a misperception as to the role of this court in resolving this dispute and in rendering its findings of fact and conclusions of law. This court certainly reviewed at the close of the evidence in this matter all relevant evidence presented by the parties, and then found the facts as stated in this court's decision. The court also has reevaluated the evidence in light of the instant motion. Counsel for the government assumes that because this court's opinion did not discuss in particular detail its weighing of each and every piece of evidence that the decision is flawed and based upon an incomplete review of the record. It is the role of counsel, and not this court, to present evidence to support his client's version of the facts and to distinguish that presentation from opposing counsel's. The

---

**4.** The government also asserts that the court did not adequately consider the testimony of the photogrammetric experts for both the plaintiff and the defendants that there existed *horizontal* gaps in the fishpond wall that measured between 10 and 30 feet. This court did consider that evidence, but did not find it dispositive of the question of whether there was a substantial *vertical* gap containing water of sufficient depth so as to permit navigation over the wall, i.e., the difference in the height of the wall within these

gaps was not shown to be significant enough to permit navigation over the wall. Thus, the government simply did not prove by a preponderance of the evidence that navigation through the horizonal gaps was possible, and the evidence as a whole convinced this court that even if there were horizontal gaps in the wall, the fishpond wall remained substantially intact and a barrier to navigation from the waters outside the fishpond wall, even at high tide.

court's role is to distill the salient facts from the whole of the evidence paying particular attention to the evidence the court finds credible and persuasive. In sum, the court's role is to adjudicate, not to litigate, this matter.

 In reviewing again the evidence which the government has presented, this court is not convinced that its findings of fact are in error with regard to the scope of the 1971 permit.

In addition to the great weight of credible testimony which supported the plaintiffs' version of the permit's scope, this court had great difficulty reconciling the government's argument which would require the court to disregard the plain language of the permit application, and of the permit itself, neither of which describes either the fishpond or the resulting unusual clover-shaped lagoon, in favor of the map which was submitted with the permit application, when the original colored map no longer exists and thus, the contents of that map, which are in significant dispute, cannot be known with any degree of certainty.[5]

### III. NAVIGABILITY AND THE JURISDICTION OF THE CORPS OF ENGINEERS UNDER THE RIVERS AND HARBORS APPROPRIATION ACT

The government also suggests that the court should have addressed the specific issue of whether the pre-development fishpond constituted "navigable waters" as that phrase is used under section 10 of the Rivers and Harbors Appropriation Act, 33 U.S.C. § 403, the portion of the law that defines the regulatory authority of the Corps of Engineers. The government contends that the determination of this issue was relevant, notwithstanding the clear evidence that Pūkóo fishpond was private property. If the court had found that section 10 did apply, the government argues, the law would have required that the Corps issue a permit that covered work within the pond as well as the work outside the pond. In the absence of affirmative evidence that the Corps was ignoring its duty to prevent what would have been unlawful excavation within Pūkóo fishpond, the government argues, the court should have concluded that the Corps upheld its duty and authorized the work within the fishpond.[6]

 The government apparently fails to appreciate the core of this court's ruling. The court was clearly convinced by the evidence brought forward that the parties did not intend that Canadian–Hawaiian be required to turn over its private property rights in Pūkóo fishpond to the government, either as a direct result of the construction of the navigable waters of Pukoo Lagoon, or as a condition to the granting of a dredging permit. The lesson from *Kai-*

---

5. As indicated in the November 27, 1989 decision in this matter, the original map submitted by plaintiff's predecessor in interest to the Corps, and which, in accordance with the Corps's regulations, was colored in red to indicate critical areas covered by the permit, was destroyed by the Corps as a part of its "record keeping" policy. The black and white microfiche copy submitted in evidence by the Corps was ambiguous and could support either party's version of the permit.

6. The court notes that it did conclude that the waters of the pre-development Pūkóo fishpond were not navigable in fact with respect to the question of whether or not a navigational servitude existed and in regard to the question of whether condition k applied to the fishpond waters.

In *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), the Su-

preme Court did not address the question of whether the pre-development Kuapa Pond was "navigable water of the United States," because in that action the government acknowledged that prior to dredging within the pond, Kuapa Pond "may once have qualified as fast land," *id.* at 170, 100 S.Ct. at 388, an assumption that Court did not disturb. The district court, the court of appeals and the Supreme Court all concluded, however, that once Kuapa Pond had been dredged and connected to navigable waters, it became subject to the Corps's jurisdiction under section 10 of the Rivers and Harbors Appropriation Act. Similarly, once Pūkóo fishpond was dredged and connected to the ocean, it too became subject to the Corps's section 10 jurisdiction. The Corps's current regulatory jurisdiction over the now Pukoo Lagoon is not in dispute in this matter; its jurisdiction to impose a navigable servitude without compensating the plaintiff is.

ser Aetna and *Vaughn v. Vermilion,* 444 U.S. 206, 100 S.Ct. 399, 62 L.Ed.2d 365 (1979) is clear: the government cannot impose a navigational servitude over what is clearly private property without the payment of just compensation.

The *Kaiser Aetna* Court did not directly address the issue of whether the Corps could impose, as a condition of a permit, the conveyance of a private property right to the public without compensation. The clear tenor of that decision, however, combined with the substantial evidence here that the parties did not intend that a transfer of property rights take place, led this court to conclude that even if the fishpond had been subject to the regulatory jurisdiction of the Corps under section 10, that status did not convey a right to impose a navigational servitude.

In carefully considering the government's argument, the court notes that the government *now* seeks to have this court rule that the Corps of Engineers is *always* aware of both the scope of its jurisdiction and its duties to enforce the law, and that plaintiff failed to rebut that presumption.[7] Even if this court were to grant the government the rebuttable presumption it seeks, the evidence clearly demonstrated that the Corps never intended to exercise its jurisdiction, if it had any, over the waters within the fishpond wall. Thus, the presumption, if one exists, has been successfully rebutted by the clear weight of the evidence.

It was further established by a preponderance of the evidence that the Corps never intended through condition k to require that Canadian–Hawaiian grant the general public access to the developed waters of Pukoo Lagoon. That condition, this court found, applied solely to navigable waters outside the fishpond, which clearly were within the Corps's jurisdiction.

The government also asserts that had the court considered the question of the Corps's jurisdiction over the pond, the court would have reached the conclusion that the fishpond waters constituted navigable waters "at or adjacent to" the area to which the permit applied.[8] In essence, the government seeks to have the court define the term "navigable waters" found in condition k as waters under the Corps's section 10 jurisdiction, and then conclude that the waters of Pūkóo fishpond were under section 10 jurisdiction and thus subject to condition k.

The definition urged by the government violates the clear principle set forth in *Kaiser Aetna* that courts, when addressing the question of whether the government has the authority to impose a navigational servitude, must look to whether the body of water involved is navigable in fact. The government, through the creative use of the permitting process, cannot achieve indirectly that which, under *Kaiser Aetna,* it may not do directly. To allow the government to define "navigable waters" through a permitting process and then to condition the granting of the permit upon a reciprocal granting of a navigational servitude over those so-defined "navigable waters" would result in a classic example of an exception swallowing the rule, and would circumvent the *Kaiser Aetna* ruling, rendering it a nullity.[9]

---

**7.** Indeed, one lesson from *Kaiser Aetna* is that the Corps does not always act to require a permit over Hawaiian fishpond waters that are being dredged. The dispute in *Kaiser Aetna* was created to a large degree by the advice given by the Corps of Engineers that a permit was not required for the work performed within Kuapa Pond. *Kaiser Aetna,* 444 U.S. at 170, 100 S.Ct. at 387. One interpretation of that advice is that the Corps did not believe that it had jurisdiction over what was recognized as private property under the Rivers and Harbors Appropriation Act. *See United States v. Kaiser Aetna,* 408 F.Supp. 42, 45 (D.Haw.1976) and *Kaiser Aetna,* 444 U.S. at 170 n. 4, 100 S.Ct. at 388 n. 4 (1979).

Another interpretation is that the Corps did not choose to exercise its authority. Either interpretation is possible with respect to the Corps's conduct in the instant matter.

**8.** Condition k in the permit set forth that "no attempt shall be made by the permittee to forbid the full and free use by the public of all navigable waters at or adjacent to the . . . work authorized by this permit."

**9.** In addition to the fact that the government's definition of navigable waters under condition k creates a definitional paradox under *Kaiser Aetna,* it also creates a permit condition that effec-

This court does not believe the Supreme Court intended the government to be able to circumvent the *Kaiser Aetna* and *Vermilion* decisions through the permitting process, and because the court is clearly convinced that the parties never contemplated the granting of a navigational servitude in exchange for the granting of a dredging permit, the court declines to disturb its ruling as suggested by the government.

## IV. THE APPLICABILITY OF KAISER AETNA

The government further objects to the manner in which the court has applied the United States Supreme Court opinion in *Kaiser Aetna* to the facts of this case. In particular, the government objects to the court's reliance upon the ancient law and customs of the Hawaiian people that fishponds were private property. The government contends that the *Kaiser Aetna* Court's discussion of the status of Kuapa Pond as private property under Hawaii law was "merely dicta, and did not significantly contribute to the [Court's] determination that the Hawaii Kai marina was not subject to a navigational servitude," Government's Memorandum in Support at 53.

The court does not find the government's argument persuasive. The court notes that the dissent in *Kaiser Aetna* (Blackmun, J.) carefully addressed why it felt that Kuapa Pond's status under state law did not affect the scope or effect of the federal navigational servitude. It appears to this court that at least the justices in dissent did not consider the majority's consideration of this issue to be "merely dicta." [10]

■ Additionally, the government fails to understand the core holding from *Kaiser Aetna*. This court concludes that *Kaiser Aetna* stands for a very simple proposition:

that when an owner connects a body of water that is recognized by law as private property into a body of water in which no private property rights are recognized and which is clearly navigable in fact, that owner does not thereby lose its private property rights if it has a reasonable, investment-backed expectation that its property rights will remain and will not be extinguished.

This interpretation of *Kaiser Aetna* is consistent with the Supreme Court's holding in *Vermilion* which was issued the same day as *Kaiser Aetna* and provided further guidance in this area of law. The *Vermilion* court considered the question of whether artificial channels built on private property and with private funds, in such a manner that they ultimately join with other navigable waterways, are open to use by the general public as a result of an overriding navigational servitude. *Id.* 444 U.S. at 208, 100 S.Ct. at 400.

The Court, in *Vermilion*, held that if the channels were constructed through the diversion or destruction of preexisting natural, navigable waterways, "the [channels] would not be private, and could not be controlled under state and federal law." *Id.* at 209, 100 S.Ct. at 401 (quoting decision below from Louisiana Court of Appeals, 356 So.2d 551, 556).

■ In a similar manner, this court had to first determine whether the pre-development fishpond was private. In making that determination, the court had to consider both the impact of Hawaii law and whether the fishpond had lost its private property status through becoming navigable in fact. Once this court determined that the pre-development fishpond was not navigable in fact and that it maintained its private property status prior to development, the court then turned its attention to

tively would condition the granting of a permit upon the reciprocal grant of a navigational servitude. As this court discusses *infra,* part V, such a condition would be constitutionally suspect under *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987).

**10.** The court also notes that, aside from the argument that the *Kaiser Aetna* decision consti-

tutes dicta on this point, the government's argument in its instant motion with respect to the weight to be given to Hawaiian law and customs, is, in substantial part, a paraphrase of Justice Blackmun's dissent, to which the government provides no attribution. The court finds no reason why it should adopt the reasoning from the dissent in *Kaiser Aetna* over that found in the majority opinion.

whether the plaintiff had a reasonable investment backed expectation that the property would remain private.

 This court found that plaintiff's predecessor in interest, Canadian–Hawaiian, invested substantial sums of money in the development of Pukoo Lagoon. The evidence of these expenditures, combined with this court's finding that it was not the intention of the plaintiff to open the Lagoon to the public through condition "k" contained within the Corps-issued permit, convinced this court that the plaintiff had a reasonable, investment-backed expectation that Pukoo Lagoon remain private property in the same manner as the former Pūkóo fishpond.

The court recognizes that its holding in this case, as well as the holdings in both *Kaiser Aetna* and *Vermilion*, are dependent upon the fact that the particular bodies of water involved in each constituted private property. Had this action involved a body of water that had never been private property, or had lost its status as private property prior to its development, then the application of *Kaiser Aetna* to the facts of this case would have been different. Nothing the government has presented through this instant motion, however, convinces this court that its original application of *Kaiser Aetna* was, or is now, in error.

## V. APPLICABILITY OF *NOLLAN*

The government also challenges this court's reliance upon *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) in its discussion of the effect of the imposition of condition k. The government contends that "the *Nollan* Court went out of its way to distinguish the *Kaiser Aetna* language regarding conditions in dredging permits on the grounds that *Kaiser Aetna* 'was affected by traditional doctrines regarding navigational servitudes' rather than 'a classic right-of-way easement,' as in *Nollan.* 483 U.S. at 832 n. 1 [107 S.Ct. at 3145 n. 1.]" From this the government reasons that *Nollan* is inapplicable.

The court, in reviewing the relevant footnote in *Nollan,* concludes that the government's broad interpretation is a misconstruction of the footnote's plain meaning. The relevant portion of footnote 1, which the government construes as the *Nollan* Court going "out of its way to distinguish *Kaiser Aetna,*" reads as follows:

> The *analysis* of *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), is not inconsistent because it was affected by traditional doctrines regarding navigational servitudes. Of course [*Kaiser Aetna* did not involve], as this [case] does, a classic right-of-way easement. *Nollan,* 107 S.Ct. at 3145 n. 1. (Emphasis added).

This court interprets the *Nollan* footnote as a simple statement by the Supreme Court that the *analysis* of *Kaiser Aetna* does not apply to *Nollan,* because the *Kaiser Aetna* analysis depends upon doctrines involving navigational servitudes, and *Nollan* does not. This does not mean that the *analysis* of *Nollan* with respect to the use of a government permitting process to condition the granting of a permit upon the forfeiture of property rights does not apply in the instant context just because the *Kaiser Aetna* analysis applies as well.

It is of note that in *Kaiser Aetna* there was no indication that the government attempted to obtain a navigational servitude in exchange for a dredging permit. In the instant matter, the court also concluded that the construction permit issued by the United States Army Corps of Engineers for the construction of the fishpond did not condition the issuance of that permit upon the granting of general public access. Had this court reached the opposite conclusion, the court would have then considered the question of whether under *Nollan* the government's action would have constituted constitutionally permissible regulation by the Corps. As noted in the decision in this matter, based upon the facts before it at trial, this court could not "conclude that the imposition of condition (k) in such a manner so as to deprive the Trust of a private property interest substantially advances a legitimate government interest, even if that interest is the improvement of navigation." 725 F.Supp. at 1523.

Thus, this court's reliance upon *Nollan* is strictly limited to the issue of how condition k was to be interpreted. Had this court concluded that condition k had been effective to transfer rights in private property to the government without compensation, the court would have then had to reach the question of whether the conditioning of the issuance of the permit upon the granting of a navigational servitude was a constitutionally permissible exercise of the government's regulatory authority.

Because the court did not conclude that condition k was effective to convert the private waters of Pukoo Lagoon into public waters (*see* part III *supra*), the question of whether condition k was constitutionally permissible under *Nollan* was addressed only to demonstrate the constitutionally infirm ground upon which condition k rested if that condition was interpreted so as to impose a navigational servitude over Pukoo Lagoon. As stated in the opinion, this court cannot conclude that interpreting condition k in that manner so as to force the conveyance of private property to the government without compensation would pass constitutional muster under *Nollan.*

In light of the limited degree this court relied upon *Nollan,* the court concludes that the government's argument regarding the court's interpretation of *Nollan* lacks merit.

## VI. THE STATUTE OF LIMITATIONS ISSUE

 Finally, the government suggests that the court erred in ruling that the statute of limitations did not bar the Trust's action. The government contends that its filing of the counterclaim mooted the need for the court to consider this issue, and that the court's discussion should be deleted from its opinion.

Although the government did not move at or prior to trial to withdraw its statute of limitations defense, the court agrees with the government in light of its now clearly stated position that it had abandoned that defense, that it is unnecessary for this court to reach that issue. Therefore, the court grants the government's motion with respect to this issue and withdraws paragraph IV. A. from its decision.

## VII. SANCTIONS

 The plaintiff has moved for sanctions against counsel for the government on the grounds that the instant motion was frivolous, objectively unreasonable, and filed for an improper purpose. Plaintiff contends that "[e]ach argument made in [the government's] motion is proper only on appeal and is substantively frivolous in this forum." Plaintiff's Memorandum in Support of Plaintiff's Motion for Sanctions at 43.

Although this court agrees with the plaintiff that the government, in the main, simply reargued matters it raised at trial and disagreed with the weight and credibility this court accorded to the evidence, this court cannot find that the motion as a whole, when construed as a motion pursuant to rule 52(b), was so egregious as to warrant sanctions by this court. The motion was not *entirely* "frivolous, legally unreasonable, or without factual foundation," *Zaldivar v. City of Los Angeles,* 780 F.2d 823, 831 (9th Cir.1986). Accordingly, the plaintiff's motion for sanctions is denied.

## CONCLUSION

For the reasons set forth above, the court grants the government's motion for reconsideration on the issue of the statute of limitations, and otherwise denies the government's motion. The court also declines to sanction the government's counsel for filing the instant motion and accordingly denies plaintiff's motion for sanctions. The decision of this court in the matter of *Boone v. United States* stands as modified by this order.

IT IS SO ORDERED.