# UNITED STATES *v.* GRAND RIVER DAM AUTHORITY.

No. 503. Argued May 17, 1960.—
Decided June 13, 1960.

*Solicitor General Rankin* argued the cause for the United States. With him on the brief were *Assistant Attorney General Morton* and *Roger P. Marquis.*

*Jess Larson* argued the cause for respondent. With him on the brief were *Q. B. Boydstun* and *Alan Y. Cole.*

Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. JUSTICE HARLAN.

Grand River is a nonnavigable tributary of the navigable Arkansas River and flows through Oklahoma. Respondent was created by the Oklahoma Legislature to develop hydroelectric power on the Grand River. It is, to use the statutory language of the law creating it, "a governmental agency and body politic and corporate." Session Laws of Oklahoma, 1935, c. 70, Art. 4, § 1. A report of the Army Corps of Engineers, made in 1930, indicated that federal development at Pensacola, Markham Ferry, and Ft. Gibson—all sites on the Grand River—was not then economically justified.[1] Respondent, following its creation in 1935, proposed a river development plan at these three sites. In 1939 the Army Engineers recommended a three-dam coordinated project as a federal undertaking.[2] Congress by the Flood Control Act of August 18, 1941,[3] incorporated that Grand River plan into a comprehensive plan for the Arkansas River basin.

Meanwhile respondent obtained a license under § 23 (b) of the Federal Power Act[4] to build and operate a project at Pensacola and completed it in 1940. The United States took over the operation of this project during World War II, after which it was returned to respondent. In 1946 the United States started the construction of a project at Ft. Gibson. It has been completed as an integral part of a comprehensive plan for the regulation of navigation, the control of floods, and the production of power on the Arkansas River and its tributaries. Congress, by modifying its plan for the Arkansas River basin,[5] cleared

---

[1] H. R. Doc. No. 308, 74th Cong., 1st Sess., Vol. 3.

[2] H. R. Doc. No. 107, 76th Cong., 1st Sess.

[3] 55 Stat. 638, 645.

[4] 49 Stat. 846, 16 U. S. C. § 817. See *Grand River Dam Authority* v. *Grand-Hydro*, 335 U. S. 359.

[5] 68 Stat. 450.

the way for respondent to obtain from the Federal Power Commission a license for a project at Markham Ferry. Thus the United States operates the Ft. Gibson project which is the farthest downstream, while the respondent has the two upstream projects. A 70-acre tract owned by the respondent was condemned when the Ft. Gibson project was built; flowage rights over its lands were acquired; and payment was made for relocation of its transmission lines. Respondent claimed more. It demanded of the United States $10,000,000 for the "taking" of its water power rights at Ft. Gibson and its franchise to develop electric power and energy at that site.[6] The Court of Claims, while reserving the question as to the amount of compensation due, held by a divided vote that the United States was liable. ⸺ Ct. Cl. ⸺, 175 F. Supp. 153. The case is here on a writ of certiorari. 361 U. S. 922.

The Court of Claims recognized that if the Grand River were a navigable stream the United States would not be liable for depriving another entrepreneur of the opportunity to utilize the flow of the water to produce power. Our cases hold that such an interest is not compensable because when the United States asserts its superior authority under the Commerce Clause to utilize or regulate the flow of the water of a navigable stream there is no "taking" of "property" in the sense of the Fifth Amendment because the United States has a superior navigation easement which precludes private ownership of the water

---

[6] Severance damages, storage and headwater benefits accruing to Ft. Gibson from the Pensacola unit, the cost and value of surveys, plans, and specifications for the Ft. Gibson unit, the loss of the use and value of lands and rights-of-way acquired for the interconnection of the Ft. Gibson unit with respondent's system and for the distribution of power from Ft. Gibson were also claimed. But these claims were denied by the Court of Claims and no review of that denial has been sought here.

or its flow. See *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53, 69; *United States* v. *Twin City Power Co.*, 350 U. S. 222, 224–225. The Government contends that the navigational servitude of the United States extends also to nonnavigable waters, pre-empting state-created property rights in such waters, at least when asserted against the Government. In the view we take in this case, however, it is not necessary that we reach that contention. Congress by the 1941 Act, already mentioned,[7] adopted as one work of improvement "for the benefit of navigation and the control of destructive floodwaters" the reservoirs in the Grand River. That action to protect the "navigable capacity" of the Arkansas River (*United States* v. *Rio Grande Irrigation Co.*, 174 U. S. 690, 708) was within the constitutional power of Congress. We held in *Oklahoma* v. *Atkinson Co.*, 313 U. S. 508, that the United States over the objection of Oklahoma could build the Denison Dam on the Red River, also nonnavigable, but a tributary of the Mississippi. We there stated, "There is no constitutional reason why Congress cannot, under the commerce power, treat the watersheds as a key to flood control on navigable streams and their tributaries." *Id.*, at 525. And see *United States* v. *Appalachian Power Co.*, 311 U. S. 377, 426; *Grand River Dam Authority* v. *Grand-Hydro*, 335 U. S. 359, 373. We also said in *Oklahoma* v. *Atkinson Co., supra,* that ". . . the power of flood control extends to the tributaries of navigable streams." *Id.*, at 525. We added, "It is for Congress alone to decide whether a particular project, by itself or as part of a more comprehensive scheme, will have such a beneficial effect on the arteries of interstate commerce as to warrant it. That determination is legislative in character." *Id.*, at 527. We held that the fact that the project had a multiple purpose was irrelevant to the

---

[7] Note 3, *supra,* at 639, 645.

constitutional issue, *id.*, at 528–534, as was the fact that power was expected to pay the way. *Id.*, at 533. "[T]he fact that ends other than flood control will also be served, or that flood control may be relatively of lesser importance, does not invalidate the exercise of the authority conferred on Congress." *Id.*, at 533–534.

We cannot say on this record that the Ft. Gibson dam is any less essential or useful or desirable from the viewpoint of flood control and navigation than was Denison Dam.[8] When the United States appropriates the flow either of a navigable or a nonnavigable stream pursuant to its superior power under the Commerce Clause, it is exercising established prerogatives and is beholden to no one. Plainly under our decisions it could license another to build the project and operate it. If respondent sued for damages for failure of the Federal Government to grant it a license to build the Ft. Gibson project, it could not claim that something of right had been withheld from it. So it is when the United States exercises its prerogative by building the project itself.[9]

Respondent, however, argues that it had a vested interest in the waters of the Grand River and points to the grant made by Oklahoma to it for the development of hydroelectric power on the Grand River. It seeks to trace the title of Oklahoma through the Cherokees who, in consideration of their agreement to remove to the territory which included the Grand River, received on December 31, 1838, a deed from the United States to the

---

[8] The findings are "There is storage capacity between elevation 554 and elevation 582 that is reserved for the control of flood waters."

[9] No riparian land is involved, and it cannot be claimed as was asserted in *United States* v. *Kelly*, 243 U. S. 316, 330, that in substance there was a taking of land. And see *United States* v. *Willow River Co.*, 324 U. S. 499, 507, which narrowly confined the holding in the *Kelly* case.

territory.[10]   By § 15 of the Act of March 3, 1893, 27 Stat. 612, 645, Congress agreed that this Cherokee land could be allotted to the members of the nation in severalty. The argument is that the United States had divested itself entirely of any rights in the water of the Grand River prior to Oklahoma's admission as a State in 1907.   Assuming, *arguendo,* that that is true, respondent's claim is not advanced.   In dealing with a grant by the United States to the Osage Indians over a nonnavigable stretch of the Arkansas River the Court in *Brewer Oil Co.* v. *United States,* 260 U. S. 77, 87–88, said:

> "The title of the Indians grows out of a federal grant when the Federal Government had complete sovereignty over the territory in question.   Oklahoma when she came into the Union took sovereignty over the public lands in the condition of ownership as they were then, and, if the bed of a non-navigable stream had then become the property of the Osages, there was nothing in the admission of Oklahoma into a constitutional equality of power with other States which required or permitted a divesting of the title."

Respondent argues that if any rights in the waters of the Grand River remained in the United States after the grant to the Indians in 1838, rights over them were later given to Oklahoma.   The reference is to § 25 of the Act of April 26, 1906, 34 Stat. 137, 146, which granted light and power companies the right to construct dams across nonnavigable streams in Cherokee territory for power and other purposes.   The right to acquire or condemn property was granted the companies in prescribed situations "subject to approval by the Secretary of the Interior."   And § 25 contained at the end a proviso critical to respondent's case and reading as follows: *"Provided,* That all rights

---

[10] See Mills, Oklahoma Indian Land Laws (1924), 27.

granted hereunder shall be subject to the control of the future Territory or State within which the Indian Territory may be situated." But this Act was no more than a regulatory measure. It did not purport to grant title to waters and appurtenant lands. The 1906 Act was an assertion of power possessed by the Federal Government to regulate Indian territory. Moreover, no water rights condemned under this Act are shown to have passed to Oklahoma and from Oklahoma to respondent. Yet the Federal Government was the initial proprietor in these western lands and any claim by a State or by others must derive from this federal title. See *United States* v. *Gerlach Live Stock Co.,* 339 U. S. 725, 747; *Federal Power Comm'n* v. *Oregon,* 349 U. S. 435. Congress has made various grants or conveyances or by statute recognized certain appropriations of lands or waters in the public domain made through machinery of the States. *United States* v. *Gerlach Live Stock Co., supra,* at 747–748; *Federal Power Comm'n* v. *Oregon, supra,* at 446–448. Yet the only Federal Act on which reliance is based by respondent for the grant of these water rights to Oklahoma is § 25 of the Act of April 26, 1906. As we have seen, that was a regulatory measure through which title might be obtained; but no water rights under it were acquired by a light or power company which is now asserted to be in respondent's chain of title. If the 1906 Act be less clear than we believe, nevertheless the construction urged by respondent would be precluded by the principle that all federal grants are construed in favor of the Government lest they be enlarged to include more than what was expressly included. See *United States* v. *Union Pacific R. Co.,* 353 U. S. 112, 116.

Respondent argues that since Oklahoma gave it rights to the waters of the Grand River, it has a compensable interest in them under the decision in *Federal Power Comm'n* v. *Niagara Mohawk Power Corp.,* 347 U. S. 239.

That decision merely held that the Federal Power Act treats "usufructuary water rights like other property rights," *id.*, at 251, making it necessary for a licensee to compensate the claimant for them. Here no licensee claims under the Federal Act; the United States builds the project on its own account.

The Court of Claims erred in failing to distinguish between an appropriation of property and the frustration of an enterprise by reason of the exercise of a superior governmental power. Here respondent has done no more than prove that a prospective business opportunity was lost. More than that is necessary as *Omnia Co.* v. *United States,* 261 U. S. 502, holds. In that case the claimant stood to make large profits from a contract it had with a steel company. But the United States, pursuant to the War Power, requisitioned the company's entire steel production. Suit was brought in the Court of Claims for just compensation. The Court, after pointing out that many laws and rulings of Government reduce the value of property held by individuals, noted that there the Government did not appropriate what the claimant owned but only ended his opportunity to exploit a contract. "Frustration and appropriation are essentially different things." *Id.*, at 513. And see *Mitchell* v. *United States,* 267 U. S. 341, 345; *United States ex rel. T. V. A.* v. *Powelson,* 319 U. S. 266, 281–283. No more need be said here.

In conclusion, the United States did not appropriate any business, contract, land, or property of respondent. It had the superior right by reason of the Commerce Clause to build the Ft. Gibson project itself or to license another to do it. The frustration of respondent's plans and expectations which resulted when the United States chose to undertake the project on its own account did not take property from respondent in the sense of the Fifth Amendment.

*Reversed.*