John H. BOONE, Esq., Trustee of the Maud Van Cortland Hill Schroll Trust, Plaintiff–Appellee,

v.

UNITED STATES of America, and Department of the Army; United States Corps of Engineers; John O. Marsh, Jr., Sec. of Army, Lieutenant General Henry J. Hatch, Brigadier General Arthur E. Williams, and Colonel F.W. Wanner, Defendants–Appellants.

No. 90–15661.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 10, 1991.

Decided Sept. 23, 1991.

Apphia T. Schley, Dept. of Justice, Washington, D.C., for defendants-appellants.

Diane D. Hastert, Damon, Key, Bocken, Leong, Kupchak, Honolulu, Hawaii, for plaintiff-appellee.

Before CHAMBERS, BRUNETTI and RYMER, Circuit Judges.

BRUNETTI, Circuit Judge:

Appellee John Boone, as trustee for the Maud Van Cortland Hill Schroll Trust ("the Trust"), brought an action against the United States to secure the Trust's right to deny public access to Puko'o Lagoon on the Island of Molokai, Hawaii. In a countersuit, the United States sought a declaration that Puko'o Lagoon is subject to the federal navigational servitude. The district court found in favor of the Trust. *See Boone v. United States*, 725 F.Supp. 1509 (D.Haw.1989), *Boone v. United States*, 743 F.Supp. 1367 (D.Haw.1990). We have jurisdiction pursuant to 12 U.S.C. § 1291 and affirm.

I.

Around 1829, native Hawaiians created Puko'o Fishpond, a littoral Hawaiian fishpond, by constructing a stone wall across an inlet to the sea.[1] The record contains no

---

1. A discussion of the history and nature of Ha-    waiian fishponds is found in the district court's

evidence of the size, condition, use, or water depth of the inlet prior to the construction of the wall. The fishpond wall was approximately 2000 feet long, ten feet wide and five feet high. The wall contained two *Makaha,* or openings to the sea, in which sluice grates were placed to allow fish to enter and exit the fishpond. Puko'o Fishpond covered about twenty-five acres; the depth of the pond ranged from one to three feet and was subject to the ebb and flow of the tides.

At the time the fishpond wall was constructed, Hawaiian fishponds were an integral part of the Hawaiian feudal system.

> Chiefs gave land, including its fishponds, to sub-chiefs, or took it away at will. Any fishponds in conquered chiefdoms became the personal property of the conquering high chief and were treated in the same manner the high chief treated all newly subjugated lands and appurtenances. The commoner had no absolute right to fish in the ponds, nor in the sector of ocean adjacent to the chief's land—all of such rights were vested in the chiefs and ultimately in the King, alone.

*United States v. Kaiser Aetna,* 408 F.Supp. 42, 46–47 (D.Haw.1976), *aff'd in part and rev'd in part,* 584 F.2d 378 (9th Cir.1978), *rev'd,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). In 1848, King Kamehameha III pronounced the Great Mahele, or land distribution. In 1852, as part of the Great Mahele, title to Puko'o Fishpond was vested in 'Ilae Napohaku, the first tax assessor on Molokai. The parties agree that Puko'o Fishpond, like all Hawaiian fishponds, had always been considered private property by landowners and by the Hawaiian government. *See Kaiser Aetna v. United States,* 444 U.S. 164, 166–67, 100

S.Ct. 383, 385–86, 62 L.Ed.2d 332 (1979) (titles to fishponds are recognized to the same extent and in the same manner as rights recognized in fast land).

In 1946, a tsunami, or tidal wave, struck and damaged the fishpond wall. The extent of the damage is in dispute. At trial, the government presented testimony of witnesses who claimed they could navigate their flat bottomed boats through holes in the wall at high tide. The Trust presented evidence that the wall was intact prior to its destruction in the early 1970s and could not be breached by boats.

Around 1960, Pukoo Properties, Inc., purchased the property surrounding and including Puko'o Fishpond. Pukoo Properties, Inc., subsequently entered into a joint venture, "Canadian–Hawaiian Developers" ("Canadian–Hawaiian"), which planned to develop the property into a resort complex. Canadian–Hawaiian obtained zoning changes and permits from the United States Army Corps of Engineers ("the Corps") and various state agencies to dredge the waters contiguous to Puko'o Fishpond. Dredging was necessary to create an approach channel to the planned Puko'o Lagoon, a boat anchorage basin, and public beaches on submerged public lands. Because the fishpond was considered private property, no permits from the County or State were required or sought for dredging inside the fishpond. *Boone,* 725 F.Supp. at 1515.[2] Canadian–Hawaiian constructed the Lagoon, which involved the destruction of the fishpond wall, between 1971 and 1973.

In 1980 Canadian–Hawaiian abandoned its development plans and sold the property and the related development rights to the Trust for $5,750,000. The Trust's representatives believed the lagoon and its wa-

---

decision, *Boone v. United States,* 725 F.Supp. 1509, 1511–12 & nn. 2–3 (D.Haw.1989), and in *United States v. Kaiser Aetna,* 408 F.Supp. 42, 46–47 (D.Haw.1976), *aff'd in part and rev'd in part,* 584 F.2d 378 (9th Cir.1978), *rev'd,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). *See also Application of Kamakana,* 58 Haw. 632, 574 P.2d 1346, 1347 n. 2 (1978) (citing R. Apple & W. Kikuchi, *Ancient Hawaiian Shore Fishponds: An Evaluation of Survivors for Historical Preservation* (1975)).

**2.** A significant issue at trial was whether a condition in the Corps' permit requiring public access to navigable waters at or adjacent to the work authorized by the permit applied to Puko'o Lagoon. The district court found that the permit and the condition applied only to the area outside the fishpond wall. *Boone,* 725 F.Supp. at 1519. The Corps does not contest this finding on appeal.

ters were private property and would not have purchased the property had they known there was a question about its private nature. *Id.* at 1519. The Trust subsequently invested an additional $340,000 to $500,000 in the property. The Trust seeks "to keep the property as clean and tranquil as possible by limiting access to the area to a limited number of organizations who share the Trust's expressed goal of promoting native Hawaiian culture." *Id.* at 1510. Public and commercial uses are excluded "so as to avoid spoilage of the property." *Id.* at 1519.

In 1982, a local charter boat operator complained to the Corps that the Trust had denied him access to Puko'o Lagoon. The Corps expressed its view that the denial of public access violated a condition in its dredging permit and the public's rights under the federal navigational servitude. In 1988, the Trust filed a declaratory judgment action to secure a right to deny public access to the lagoon. After cross-motions for summary judgment were denied, the Corps filed a counter-suit seeking, inter alia, a declaration that the Lagoon is subject to the federal navigational servitude. After a bench trial, the district court found that although Puko'o Lagoon is presently navigable, the lagoon was not subject to the navigational servitude and the Corps could not require public access without payment of compensation under the fifth amendment. *Id.* at 1525. The Corps filed a motion to alter or amend the judgment which was denied in the part pertinent to this appeal. 743 F.Supp. 1367, 1371–73, 1374–77 (D.Haw.1990). The Corps then brought this appeal.

## II.

The Corps makes two arguments on appeal. First, it contends that the district court erred in finding that the area presently comprising Puko'o Lagoon was not navigable in fact within the meaning of the federal navigational servitude at the time the fishpond wall was destroyed in the early 1970s. Second, the Corps argues, regardless of the navigability of the fish-

pond in 1970, the Lagoon is subject to the navigational servitude because the area was a navigable inlet of the Pacific Ocean in its natural state.

Whether Puko'o Lagoon is subject to the navigational servitude is a mixed question of fact and law. The application of a rule of law to established facts is reviewed de novo when the question requires consideration of legal concepts in mix of facts and law. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Essentially factual inquiries or the establishment of historical facts, however, are reviewed for clear error. *Id.* at 1202–04. We give special deference to the district court's credibility findings. *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

### A. *The Commerce Clause and the Navigational Servitude.*

The commerce clause [3] supports two distinct but often overlapping phenomena relevant to this appeal: the congressional authority to regulate the nation's interstate waterways and the federal navigational servitude. *Kaiser Aetna v. United States*, 444 U.S. 164, 173, 177, 100 S.Ct. 383, 389, 391, 62 L.Ed.2d 332 (1979). Clarification of this distinction is useful for the resolution of this case.

"Commerce," the Supreme Court explained, "includes navigation. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a State other than those in which they lie." *Gilman v. Philadelphia*, 70 U.S. (3 Wall.) 713, 724–25, 18 L.Ed. 96 (1866). *See also Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 190, 6 L.Ed. 23 (1824) ("[a]ll America understands, and has uniformly understood, the word 'commerce,' to comprehend navigation"). Since *Gibbons v. Ogden*, the authority to regulate waterways under the commerce clause has been extended beyond

---

3. U.S. Const. art. I, § 8, cl. 3.

control over waters navigable in fact[4] to nonnavigable tributaries,[5] waters which were once navigable in fact but are no longer so,[6] and water neither formerly nor presently navigable but which may be made navigable by reasonable improvements.[7] This expansion of the power to regulate navigable waters parallels, and is coextensive with, the expansion of the power to regulate commerce generally.

In *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940), the respondent power company argued that the government may regulate water rights "only in so far as necessary to protect navigation or navigable capacity." *Id.* at 393, 61 S.Ct. at 291. The Court rejected such a limited view and found that Congress had the authority under the commerce clause to require riparian land owners to obtain a license prior to the construction of dams even where the river was not, nor ever had been, navigable but could become navigable through reasonable congressionally authorized improvements.

[I]t cannot properly be said that the constitutional power of the United States over its waters is limited to control for navigation. By navigation respondent means no more than operation of boats and improvement of the waterway itself. In truth the authority of the United States is the regulation of commerce on its waters. Navigability, in the sense just stated, is but a part of this whole. Flood protection, watershed development, recovery of the cost of improvements through utilization of power are likewise parts of commerce control.... [The authority to regulate waterways] is as broad as the needs of commerce.... The point is that navigable waters are subject to national planning and control in the broad regulation of commerce granted the Federal Government.

*Id.* at 426–27, 61 S.Ct. at 308. *Appalachian Electric*'s expansive view of navigation is consistent with the Court's expansive interpretations of commerce in other areas during the same period. *Cf., N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). *See Kaiser Aetna*, 444 U.S. at 174, 100 S.Ct. at 389; Morreale, *Federal Power in Western Waters: The Navigation Power and the Rule of No Compensation*, 3 Nat.Resources J. 1, 5–6 nn. 22, 23 (1963).

■ Though similarly grounded in the commerce clause, *Kaiser Aetna*, 444 U.S. at 177, 100 S.Ct. at 391, *United States v. Rands*, 389 U.S. 121, 122, 88 S.Ct. 265, 266, 19 L.Ed.2d 329 (1967), the navigational servitude is distinct from the power to regulate navigable waters. *Kaiser Aetna*, 444 U.S. at 174–75, 100 S.Ct. at 389–90, *Swanson v. United States*, 789 F.2d 1368, 1371–72 (9th Cir.1986). Described as a "dominant servitude," *United States v. Cherokee*

4. *See The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870) in which the Court stated,

Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

Although *The Daniel Ball* involved an interpretation of navigability for purposes of admiralty jurisdiction, its "navigable in fact" test has been adopted by cases interpreting Congress' power under the commerce clause, *see United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 406 & n. 21, 61 S.Ct. 291, 298 & n. 21, 85 L.Ed. 243 (1940), as well as cases discussing the navigational servitude, *see United States v. Cress*, 243

U.S. 316, 323, 37 S.Ct. 380, 383, 61 L.Ed. 746 (1917).

5. *See, e.g., United States v. Grand River Dam Authority*, 363 U.S. 229, 232, 80 S.Ct. 1134, 1136, 4 L.Ed.2d 1186 (1960), *Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 525, 61 S.Ct. 1050, 1059, 85 L.Ed. 1487 (1941).

6. *See, e.g., Arizona v. California*, 283 U.S. 423, 453–54, 51 S.Ct. 522, 525, 75 L.Ed. 1154 (1931), *Economy Light & Power Co. v. United States*, 256 U.S. 113, 122–23, 41 S.Ct. 409, 412, 65 L.Ed. 847 (1921). *See also United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 408, 61 S.Ct. 291, 299, 85 L.Ed. 243 (1940) ("[w]hen once found navigable, a waterway remains so").

7. *Appalachian Power*, 311 U.S. at 407–09, 61 S.Ct. at 299–300.

*Nation of Oklahoma,* 480 U.S. 700, 704, 107 S.Ct. 1487, 1490, 94 L.Ed.2d 704 (1987), *Federal Power Comm'n v. Niagara Mohawk Power Corp.,* 347 U.S. 239, 249, 74 S.Ct. 487, 493, 98 L.Ed. 666 (1954), a "plenary authority," *South Carolina v. Georgia,* 93 U.S. 4, 10, 23 L.Ed. 782 (1876), and a "superior navigation easement," *United States v. Grand River Dam Authority,* 363 U.S. 229, 231, 80 S.Ct. 1134, 1136, 4 L.Ed.2d 1186 (1960), the navigational servitude generally relieves the government of the obligation to pay compensation for acts interfering with the ownership of riparian, littoral, or submerged lands which, if not for the fact that a waterway is involved, would require compensation under the fifth amendment.[8] *See* Tarlock, *Law of Water Rights and Resources* § 9.04[2][a] (1990). This "rule of no compensation" is based in part on the tenuous nature of private property ownership of riparian, littoral, and submerged lands. *See, e.g., Cherokee Nation,* 480 U.S. at 704, 107 S.Ct. at 1490 (when the government exercises its rights pursuant to the servitude, there has been no " 'invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the fifth amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject.' ") (quoting *Rands,* 389 U.S. at 123, 88 S.Ct. at 267); *Lewis Blue Point Cultivation Oyster Co. v. Briggs,* 229 U.S. 82, 87–88, 33 S.Ct. 679, 680, 57 L.Ed. 1083 (1913) (because the public right of navigation is a "dominant right ... [t]he plaintiff ... has, therefor, no such private property right which ... entitles him to demand just compensation"); *Owen v. United States,* 851 F.2d 1404, 1408 (Fed. Cir.1988) ("[t]he nation's navigable waterways have always been considered 'public property' ").

The origin of this "unique position" held by the government over navigable waters, *Rands,* 389 U.S. at 122, 88 S.Ct. at 266, is not entirely clear. *See* Morreale, *supra,* at 21 (although the [no compensation] rule is "firmly established ..., there is little explanation of its origin or basis to be found in either the cases or the literature"). Though its constitutional foundation is the commerce clause,[9] it appears to be based in part on considerations of the common law doctrines of *jus publicum* and public trust.[10] *See* MacGrady, *The Navigability*

**8.** Though the navigational servitude reflects a "dominant right" held by the government over the navigable waters of this country, *Cherokee Nation,* 480 U.S. at 705, 107 S.Ct. at 1490, it is unclear whether it immunizes the government from a takings claim. Though riparian and littoral landowners hold only "a qualified title, a bare technical title, not at [their] absolute disposal ... but to be held at all times subordinate to such use of the submerged lands and of the waters following over them as may be consistent with or demanded by the public rights of navigation," *Scranton v. Wheeler,* 179 U.S. 141, 163, 21 S.Ct. 48, 57, 45 L.Ed. 126 (1900), the Supreme Court "has never held that the navigational servitude creates a blanket exception to the Takings Clause." *Kaiser Aetna,* 444 U.S. at 172, 100 S.Ct. at 389; *see also Cherokee Nation,* 480 U.S. at 704, 107 S.Ct. at 1490.

**9.** The label, "servitude," implies a property interest. How a constitutional grant of authority to Congress creates such an interest is explained in *United States v. Twin City Power Co.,* 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956). The Court stated:

The interest of the United States in the flow of a navigable stream originates in the Commerce Clause. That Clause speaks in terms of power, not of property. But the power is a dominant one which can be asserted to the exclusion of any competing or conflicting one. The power is a privilege which we have called "a dominant servitude," or "a superior navigation easement."

*Id.* at 224–25, 76 S.Ct. at 261 (citations omitted). *See also Swanson v. United States,* 789 F.2d 1368, 1372 (9th Cir.1986). This does not explain, however, why, in the context of navigable waters, this power is so dominant.

**10.** *Jus publicum,* in this context, is the sovereign's right to jurisdiction and control over navigable waters for the benefit of the public. Morreale, *supra,* at 26. The public trust doctrine asserts that "states own the submerged soil and foreshore of all navigable bodies of water." MacGrady, *The Navigability Concept in the Civil and Common Law: Historical Development, Current Importance, and Some Doctrines that Don't Hold Water,* 3 Fla.St.U.L.Rev. 511, 589 (1975). These theories are supported by *Martin v. Waddell's Lessee,* 41 U.S. (16 Pet.) 367, 10 L.Ed. 997 (1842) which held that "dominion and property in navigable waters, and in the lands under them, [were] held by the king as a public trust." *Id.* at 411. "[W]hen the Revolution took

*Concept in the Civil and Common Law: Historical Development, Current Importance, and Some Doctrines that Don't Hold Water,* 3 Fla.St.U.L.Rev. 511, 589–91 (1975), Morreale, *supra,* at 25–28. Incorporating these historical accounts is a "notice" rationale for the servitude:

> The best explanation for the special no compensation rule of the navigation servitude is that the long history of the recognition and protection of public rights of navigation, even against the sovereign, has put all riparians on notice that private claims inconsistent with the exercise of the servitude will not be recognized.

Tarlock, *supra,* at § 9.04[2][a]; *see also United States v. Kansas City Life Ins. Co.,* 339 U.S. 799, 808, 70 S.Ct. 885, 890, 94 L.Ed. 1277 (1950) ("[t]he owners use of property riparian to a navigable stream long has been limited by the right of the public to use the stream in the interest of navigation.... There thus has been ample notice over the years that such property is subject to a dominant public interest"), *Union Bridge Co. v. United States,* 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523 (1907) (company constructed its bridge "with knowledge of the paramount authority of Congress"), Morreale, *supra,* at 23–25 ("all who make use of navigable waterways presumably 'know' that any rights they may acquire are subject to destruction without compensation").

The navigational servitude, unlike the power to regulate navigable waters under the commerce clause, is not coextensive with Congress' regulatory authority. First, unlike Congress' power to regulate waters for purposes of navigation, the navigational servitude "does not extend be-

yond the high-water mark" of navigable streams. *Rands,* 389 U.S. at 122, 88 S.Ct. at 266; *see also Kansas City Life Ins.,* 339 U.S. at 808, 70 S.Ct. at 890, *United States v. Willow River Co.,* 324 U.S. 499, 509, 65 S.Ct. 761, 767, 89 L.Ed. 1101 (1945). Thus, although the commerce clause power to regulate navigable waters permits, for example, regulatory authority over the nonnavigable tributaries of streams, *see United States v. Grand River Dam Authority,* 363 U.S. 229, 232, 80 S.Ct. 1134, 1136, 4 L.Ed.2d 1186 (1960),[11] the navigational servitude would not cover the same tributaries, *see United States v. Cress,* 243 U.S. 316, 326–27, 37 S.Ct. 380, 384, 61 L.Ed. 746 (1917), *Goose Creek Hunting Club, Inc. v. United States,* 518 F.2d 579, 582, 207 Ct.Cl. 323 (1975).

Second, the determination of navigability is different in different contexts. *Kaiser Aetna,* 444 U.S. at 171, 100 S.Ct. at 388. A waterway may be subject to the navigational servitude if it is navigable in fact in its natural state. *Kaiser Aetna,* 444 U.S. at 175, 100 S.Ct. at 390, *Cress,* 243 U.S. at 322–23, 37 S.Ct. at 382–83. Waterways are navigable in fact " 'when they are used, or are susceptible of being used, *in their ordinary condition,* as highways of commerce.' " *Cress,* 243 U.S. at 323, 37 S.Ct. at 383 (quoting *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870) (emphasis in *Cress* )).[12] By contrast, as explained above, navigability for purposes of the commerce clause authority to legislate, has been expanded to include both waterways once navigable but no longer so, and waterways never navigable but which may become so with reasonable improvements. *See Appalachian Electric,*

---

place, the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for the own common use." *Id.* at 410. The commerce clause and the supremacy clause of the Constitution transferred jurisdiction over interstate navigable waters to the federal government. *See South Carolina v. Georgia,* 93 U.S. 4, 10, 12, 23 L.Ed. 782 (1876).

**11.** The Court in *Grand River Dam Authority* declined to decide whether the navigational servitude extends to nonnavigable tributaries. 363

U.S. at 232, 80 S.Ct. at 1136. Relying instead on the Flood Control Act of 1941, enacted under the commerce clause, the Court found the government did not take the respondent's property within the meaning of the fifth amendment. *Id.* at 236, 80 S.Ct. at 1138.

**12.** Though waters navigable in fact *may* be subject to the navigational servitude, the Supreme Court has rejected a mechanical test imposing the servitude on all waters navigable in fact. *Kaiser Aetna,* 444 U.S. at 175, 100 S.Ct. at 390. *See infra* Part II.C.2.

311 U.S. at 408, 61 S.Ct. at 299. Under this broad view of navigability, "[t]heoretically at least, there are no waters in the United States immune from [the power to regulate] navigation." Morreale, *supra*, at 9.

### B. *Navigability of Puko'o Fishpond.*

The district court, after "weighing the evidence submitted by both parties on the disputed issue of the navigability of the pond, [found] the Trust's evidence to be more persuasive than that submitted by the government." *Boone*, 725 F.Supp. at 1513. The Corps finds fault with this finding and the district court's rationale in arriving at its conclusion.

#### 1. *Consistency of the Corps' Witnesses.*

■ The district court found that the Corps' witnesses gave inconsistent testimony "as to their alleged points of entry into the fishpond as well as to the specific means they claim to have used to navigate the fishpond." *Boone*, 725 F.Supp. at 1512. The Corps argues that the descriptions of different points of entry indicates several breaks in the damaged wall and merely points out the significant deterioration of the fishpond wall. As to the question of whether the fishpond wall was in a state of disrepair and the fishpond navigable through damaged portions of the wall, the Corps argues their witnesses were entirely consistent.

The district court did not state what precise effect or weight the inconsistencies had in its decision. In the Corps' motion to alter or amend the district court's decision, the Corps made an argument similar to that presented here. The district court then clarified its view of the Corps' witnesses:

> This court carefully evaluated the testimony of each of those witnesses and weighed their demeanor and credibility (including any apparent motive or bias)—items which cannot be discerned simply by reading a transcript of the trial. The court found, and continues to believe, that the testimony of these government witnesses was inconsistent and not as credible as the testimony of plaintiff's witnesses on this issue.
>
> . . . .
>
> The court does not accept the government's argument that the admitted inconsistencies within the testimony of its five fact witnesses reflect the state of disrepair of the fishpond wall rather than the credibility of their testimony.

743 F.Supp. at 1371–72. The district court's language indicates that it's finding of inconsistencies in the Corps' witnesses' testimony was in part connected with its consideration of the witnesses' credibility. In light of the special deference we give to such findings, *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), we cannot find the district court's treatment of the Corps' fact witnesses was clearly erroneous.

#### 2. *Credibility Findings.*

■ The Corps next argues that the district court's rationale for finding the Trust's witnesses more credible than its own was erroneous. The Corps finds fault with the following statement made by the district court:

> The government has presented the testimony of several residents of Molokai who claim to have navigated from Puko'o Harbor into Puko'o Fishpond, as admitted trespassers, in flat bottom boats over the fishpond wall to take fish from what they knew to be private property. The court notes that these individuals claim to have surreptitiously entered the fishpond by methods designed to avoid detection by the authorities or others.

725 F.Supp. at 1512. The Corps argues that whether the witnesses thought they were violating the law when they entered the fishpond is not probative as to whether they actually navigated into the pond. The witnesses' willingness to violate the law is relevant, however, to consideration of their veracity and motive in testifying. The district court could have concluded that a witness who will knowingly break the law is less trustworthy on the witness stand. Also, the court could have believed that these witnesses are biased toward's the Corps' position in that they have an inter-

est in requiring public access, *i.e.*, fishing in the now navigable lagoon, which affected their testimony. Moreover, the Corps appears to exaggerate the importance of the court's statement. The court did not expressly base its findings regarding navigability on the fact that the Corps' witnesses were "admitted trespassers," but merely "notes" the fact.

The Corps also argues the district court's description of a Trust witness demonstrates the court's erroneous reasoning. The court stated:

> The court finds particularly persuasive the testimony of a disinterested, life-long Puko'o, Molokai resident, Laura Duvauchelle Smith, who was intimately familiar with the fishpond and its surrounding environs from her childhood.

*Id.* at 1512. The Corps argues that this description does not differentiate this witness from most of the Corps' witnesses. Though perhaps true, the failure to also describe some of the Corps' witnesses in the same manner is not grounds for reversal. The court found Smith's testimony "particularly persuasive" and was entitled to give it more weight.

### 3. *Reliance on the Trust's Witnesses.*

The Corps argues that the court's reliance on the testimony of two of the Trust's witnesses, Dr. Grigg and Captain Brodie, was clearly erroneous.

Dr. Grigg was hired by the Hawaii Department of Health in 1971 to study the potential environmental impact of dredging in Puko'o Harbor. On one day in 1971, Dr. Grigg spent about three hours snorkeling in and around Puko'o Fishpond. At the time he swam alongside the wall the water was at "a high low tide." High tide is about two feet above the low tide. Dr. Grigg testified that he swam along the inside of the fishpond wall from the western corner to the middle of the wall. At that point he climbed over the wall and swam offshore. He testified that the water was two to three feet deep and at the point he climbed over the wall it was two to three feet high. It is not clear from our record of the testimony if he meant the wall was two to three feet above the *fishpond floor* or above the *water line.*

The Corps argues that Grigg's testimony indicates that the wall was two to three feet above the fishpond floor as was the water depth at low tide; therefore the water was at the top of the wall during low tide and, *a fortiori*, above the wall at high tide. This requires a strained interpretation of the testimony. When asked how high the wall was when he climbed over it, Grigg stated, "having got out of the water and actually climbed out with my fins and camera, [I estimate it] to be about two to three feet." If the water was at the top of the wall, as the Corps argues his testimony reveals, this statement appears unlikely. If the wall was the same height to the pond's floor as the depth of the water, it would seem strange to have to estimate its height by reference to climbing out of the water and over the wall.

The court's view of the testimony is supported by other testimony of Grigg. Grigg did not see any breaks in the wall, observe any areas he could swim through the wall, or see any place where the wall was not out of the water. He also stated that he did not believe that it was possible to navigate a boat from the ocean into the pond, and that he "didn't see any place where the wall was under water, or even awash, for that matter." Though the Corps' view of Grigg's testimony is remotely plausible, the court's interpretation was not clearly erroneous.

Captain Brodie testified that in 1970 he walked the full length of the fishpond wall in connection with his work with a dredging company. The court found this testimony "probative." 725 F.Supp. at 1513. The Corps argues that reliance on this testimony is inappropriate because it is not clear whether he walked across at high tide or low tide. Though not conclusive, the evidence is certainly probative and the court did not err by giving it due weight.

In sum, we reject the Corps' first argument. The record supports the district court's conclusion that "the fishpond wall in its ordinary state constituted a barrier to navigation," *Boone*, 725 F.Supp. at 1513,

and it did not err in finding that Puko'o inlet was not navigable in fact.

### 4. *Photographic Experts.*

The district court also heard expert testimony from the Corps' photogrammetric technician and the Trust's photogrammetric engineer regarding their conclusions drawn from various aerial and ground level photographs. The court concluded, "In light of all other relevant evidence, the court finds the testimony of the Trust's expert witness to be more credible than that of defendants' expert witness." *Id.* at 1512. The Corps argues that the court's reliance on the testimony is misplaced and contests the probative value of the ground level photographs submitted by the Trust. Though different interpretations and conclusions regarding this evidence is possible, the court's reliance was not clearly erroneous.

### C. *The Dormant Navigational Servitude.*

The Corps argues that regardless of the navigability of the walled fishpond, a "dormant navigational servitude" attached to the fishpond by virtue of the original navigability of the area.[13] This dormant servitude, the Corps argues, was reactivated by the destruction of the wall when the area again became navigable in interstate commerce. The Corps relies almost solely on *Economy Light & Power Co. v. United States*, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921), for support of its "dormant servitude" theory.

### 1. *The Applicability of* Economy Light.

In *Economy Light*, the United States sought an injunction against the building of a dam by a power company across the Desplaines River. The United States argued that the building of the dam without the permission of the government violated the Rivers and Harbors Appropriation Act.

This Act prohibits the construction of dams over navigable waters without the prior permission of Congress. 33 U.S.C. § 403. The Power Company argued that permission was unnecessary because the Desplaines River was not navigable within the meaning of the Act.

Until at least 1825, the Desplaines River was navigable and used commercially. Several natural and human-made events subsequently rendered the river impassable and, at the time the case was decided, the river had "been out of use for a hundred years." *Economy Light*, 256 U.S. at 124, 41 S.Ct. at 413. The most significant of these events was the building of other dams "without authority from the United States." *Id.* at 118, 41 S.Ct. at 411. The Court found the river was navigable under the Act even though "there was no evidence of actual navigation within the memory of living men." *Id.* at 117, 41 S.Ct. at 410. "[A] river having actual navigable capacity in its natural state and capable of carrying commerce among the States," the Court held,

> is within the power of Congress to preserve for purposes of future transportation, even though it be not at present used for such commerce, and be incapable of such use according to present methods, either by reason of changed conditions or because of artificial obstructions.

*Id.* at 123, 41 S.Ct. at 413.

The Corps argues that in light of the original navigability of the inlet, the district court "evaded the inescapable conclusion that Puko'o Lagoon is subject to a navigational servitude under *Economy Light.*" *Economy Light*, however, defined navigability for purposes of determining the reach of congressional regulation under the commerce clause and the applicability of the Rivers and Harbors Appropriation Act. The parties do not dispute that Puko'o Lagoon is within the regulatory jur-

---

**13.** The Corps' argument assumes that the inlet, which was segregated from the Pacific Ocean by the construction of the fishpond wall, was navigable water within the meaning of the navigational servitude. The district court, however, made no express finding on the navigability of the area prior to the construction of the wall and the record is inconclusive. Because we reject the Corps' dormant servitude theory, no further fact-finding on this issue is necessary.

isdiction of the Corps.[14] The question here is whether the Corps may require public access to the Lagoon and thereby deprive the Trust of "one of the most essential sticks in the bundle of rights that are commonly characterized as property—the right to exclude others." *Kaiser Aetna*, 444 U.S. at 176, 100 S.Ct. at 391. *See also Evers v. County of Custer*, 745 F.2d 1196, 1201 (9th Cir.1984) ("[a] property owner's right to exclude other is 'universally held to be a fundamental element of the property right' ") (quoting *Kaiser Aetna*, 444 U.S. at 179–80, 100 S.Ct. at 393). Because the Corps' attempt to require public access implicates the takings clause, we are faced with a question distinct from the preliminary issue of the Corps' jurisdiction or Congress' commerce clause authority to grant that jurisdiction.

The Supreme Court has rejected the notion that navigability for purposes of the takings clause is coterminous with navigability for purposes of regulatory power or admiralty jurisdiction. *Kaiser Aetna*, 444 U.S. at 170–173, 100 S.Ct. at 387–89. Cases interpreting navigability cannot be "simply lumped into one basket," the Court stated, and " 'any reliance upon judicial precedent must be predicated upon careful appraisal of the *purpose* for which the concept of "navigability" was invoked in a particular case.' " *Kaiser Aetna*, 444 U.S. at 170, 100 S.Ct. at 388 (quoting *Kaiser Aetna*, 408 F.Supp. 42, 49 (1976)); *see also Oregon v. Riverfront Protection Assoc.*, 672 F.2d 792, 795 n. 2 (9th Cir.1982) (interpreting navigation for purpose of determining title to submerged lands); MacGrady, *The Navigability Concept in the Civil and Common Law: Historical Development, Current Importance, and Some Doctrines that Don't Hold Water*, 3 Fla.St.U.L.Rev. 511, 515 (1975) ("a body of water [may] be navigable for one federal purpose but not for another").

In *Kaiser Aetna*, the Court rejected the government's reliance on several cases interpreting navigability stating:

> It is true that Kuapa Pond may fit within definitions of "navigability" articulated in past decisions of this Court. But it must be recognized that the concept of navigability in these decisions was used for purposes other than to delimit the boundaries of the navigational servitude: for example, to define the scope of Congress' regulatory authority under the Interstate Commerce Clause, to determine the extent of the authority of the Corps of Engineers under the Rivers and Harbors Appropriation Act of 1899, and to establish the limits of the [admiralty] jurisdiction of federal courts.... Although the Government is clearly correct in maintaining that the now dredged Kuapa Pond falls within the definition of "navigable waters" as this Court has used that term in delimiting the boundaries of Congress' regulatory authority under the Commerce Clause, this Court has never held that the navigational servitude creates a blanket exception to the Takings Clause whenever Congress exercises its Commerce authority to promote navigation. Thus, while Kuapa Pond may be subject to regulation by the Corps of Engineers, acting under the authority delegated it by Congress in the Rivers and Harbors Appropriation Act, it does not follow that the pond is also subject to a public right of access.

*Id.* at 172, 100 S.Ct. at 388–89 (citations omitted). This language applies with equal force here. Whether the Corps' attempt to require public access to Puko'o Lagoon is within their statutory, or Congress' consti-

---

**14.** Under the test stated in *Economy Light,* not only Puko'o Lagoon but also the walled fishpond would undoubtedly have been subject to the regulatory power of Congress even though Puko'o Fishpond was "incapable of [carrying commerce among the States] according to present methods." *Economy Light*, 256 U.S. at 123, 41 S.Ct. at 413. *See* 33 C.F.R. § 329.4 (the Corps' regulatory jurisdiction covers all "waters that are subject to the ebb and flow of the tide and or are presently used, or have been used in the past, or may be susceptible for use" in interstate commerce); *See also United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 408, 61 S.Ct. 291, 299, 85 L.Ed. 243 (1940) ("[t]he power of Congress over commerce is not to be hampered because of the necessity for reasonable improvements to make an interstate waterway available for traffic").

tutional, power is not at issue here; our concern is whether that attempt goes so far as to constitute a taking. Accordingly, though the original navigability of the area is a relevant consideration in determining whether the navigational servitude attaches to the area, *see Kaiser Aetna*, 444 U.S. at 176, 178, 100 S.Ct. at 391, 392 *United States v. Cress*, 243 U.S. 316, 324, 37 S.Ct. 380, 383, 61 L.Ed. 746 (1917), we reject the Corps' argument that *Economy Light* requires the imposition of the servitude as a matter of law in all instances where the area was once but is no longer navigable.[15]

### 2. The Applicability of Kaiser Aetna.

The district court found this case indistinguishable from *Kaiser Aetna*. *Boone*, 725 F.Supp. at 1521. As in this case, the property at issue in *Kaiser Aetna*, Kuapa Pond, was previously a Hawaiian fishpond. Though Kuapa Pond was used by fishermen, their boats had no access to the waters beyond the barrier beach, 444 U.S. at 178–79 n. 10, 100 S.Ct. at 392 n. 10, and the pond "was incapable of being used as a continuous highway for the purpose of navigation in interstate commerce." *Id.* at 178, 100 S.Ct. at 392. The depth of Kuapa Pond, which was subject to the ebb and flow of the tides, was never more than two

feet. *Id.* Unlike Puko'o Fishpond, Kuapa Pond was a natural fishpond. *Id.* at 166, 100 S.Ct. at 385. Separated from the ocean by a barrier beach, native Hawaiians reinforced the natural sandbar of Kuapa Pond with stone walls. *Id.*

Kaiser Aetna leased property adjacent to and including Kuapa Pond for subdivision development. *Id.* at 167, 100 S.Ct. at 386. Kaiser Aetna developed Kuapa Pond into a marina which included an 8–foot–deep channel connecting Kuapa Pond to a neighboring bay and the Pacific Ocean, and controlled access to and use of the marina. *Id.* at 167–68, 100 S.Ct. at 386. A dispute arose between the Corps and Kaiser Aetna concerning the Corps' regulatory jurisdiction over the marina under the Rivers and Harbors Appropriation Act of 1899, and whether the federal navigational servitude precluded Kaiser Aetna from denying public access to the marina. *Id.* The district court found that although the Corps could regulate Kuapa Pond, the navigational servitude did not apply. 408 F.Supp. at 53, 54. This court reversed, holding that the navigational servitude attached to the fishpond "[b]y virtue of the water's presence." 584 F.2d at 384. The Supreme Court granted certiorari to clarify the "scope and nature of the servitude." 444 U.S. at 166, 100

---

**15.** The Corps also relies on *Loving v. Alexander*, 745 F.2d 861 (4th Cir.1984). In *Loving*, the Fourth Circuit reviewed a district court's ruling that a certain portion of the Jackson River in Virginia was a "navigable water of the United States" within the meaning of regulations defining the Corps' authority, *see* 33 C.F.R. § 329, and that the Corps' plans to provide public access across the plaintiffs' riparian land did not constitute a taking under the fifth amendment. 745 F.2d at 863. Relying in part on *Appalachian Electric* and *Economy Light*, the court found that because the portion of the river in question was previously—though no longer— navigable in interstate commerce, the river segment met "the federal test of navigability." 745 F.2d at 867.

The *Loving* court then affirmed the district court's holding regarding the plaintiffs' taking claim. Without separately determining navigability for purposes of the navigational servitude, the court stated:

The navigational servitude has existed since the ratification of the Constitution, so nothing has been taken from the property owners

subject to it by the declaration of the Corps of its existence. Thus, the plaintiffs are not entitled to compensation merely on that account. *Id.* The Corps argues that *Loving* supports their theory that waterways once navigable are presently subject to the navigational servitude. Though the Fourth Circuit did not, as required by *Kaiser Aetna*, distinguish among cases interpreting navigability, the district court's decision in *Loving* did. Though the district court recognized that "navigability for purposes of regulation did not equal navigability for purposes of imposing a navigational servitude," *Loving v. Alexander*, 548 F.Supp. 1079, 1091 (W.D.Va. 1982), *aff'd*, 745 F.2d 861 (4th Cir.1984), it found on the facts before it that the navigational servitude attached. Thus, viewed in the context of the decision it affirmed, we do not believe the Fourth Circuit's affirmance of the district court's navigational servitude analysis should be read as the broad holding the Corps asserts. In any case, to the extent *Loving* can be read to equate navigability for purposes of the Corps' regulatory authority with navigability under the navigational servitude, we decline to follow it.

S.Ct. at 385.[16]

"The navigational servitude," the Court stated,

is an expression of the notion that the determination whether a taking has occurred must take into consideration the important public interest in the flow of interstate waters that in their natural condition are in fact capable of supporting public navigation.

*Id.* at 175, 100 S.Ct. at 390. Thus, even though private persons may have an economic interest or advantage in a navigable waterway, courts may or may not—in light of the public's interest—recognize the private interests as having " 'the law back of them.' " *Id.* at 178, 100 S.Ct. at 392 (quoting *United States v. Willow River Co.,* 324 U.S. 499, 502, 65 S.Ct. 761, 764, 89 L.Ed. 1101 (1945)). There is a sufficiently important public interest in " 'the running water in a great navigable stream,' " for example, that courts recognize it " 'is [incapable] of private ownership.' " *Id.,* 444 U.S. at 175, 100 S.Ct. at 390 (quoting *United States v. Chandler–Dunbar Co.,* 229 U.S. 53, 69, 33 S.Ct. 667, 674, 57 L.Ed. 1063 (1913)). Though the Court acknowledged that this important public interest has generally led to the conclusion that the navigational servitude will preclude the payment of compensation in cases involving waters navigable in interstate commerce, *id.,* a per se rule that all naturally navigable waters are thereby subject to the servitude was rejected.

Without defining more precisely the nature of the important public interest or when submerged, littoral, or riparian lands

do or do not have "the law back of them," the Court concluded that Kuapa Pond "is not the sort of 'great navigable stream' that [the] Court has previously recognized as being '[incapable] of private ownership.' " *Id.,* 444 U.S. at 179, 100 S.Ct. at 392 (quoting *Chandler–Dunbar,* 229 U.S. at 69, 33 S.Ct. at 674). "More than one factor contributes to this result," the Court explained:

It is clear that prior to its improvement, Kuapa Pond was incapable of being used as a continuous highway for the purpose of navigation in interstate commerce. Its maximum depth at high tide was a mere two feet, it was separated from the adjacent bay and ocean by a natural barrier beach, and its principal commercial value was limited to fishing.... And, as previously noted, Kuapa Pond has always been considered to be private property under Hawaiian law.

*Id.,* 444 U.S. at 178–79, 100 S.Ct. at 392 (footnotes omitted). The Court declined to decide "whether in some circumstances one of these factors by itself may be dispositive." *Id.* at 178 n. 9, 100 S.Ct. at 392 n. 9.

Though factually different in some respects, we must come to the same conclusion reached by the Court in *Kaiser Aetna.* Like Kuapa Pond, Puko'o Fishpond was incapable of use as a continuous highway for the purpose of navigation in interstate commerce. Indeed, there is little evidence in the record of any commercial use of Puko'o Fishpond since 1957. Though the maximum depth of the Fishpond was three feet—one foot more than the depth of Kuapa Pond—this fact does not render this case distinguishable. The Supreme Court

16. The Supreme Court also considered, and decided on the same day as *Kaiser Aetna, Vaughn v. Vermilion,* 444 U.S. 206, 100 S.Ct. 399, 62 L.Ed.2d 365 (1979). *Vaughn* involved a system of manmade canals subject to tidal fluctations and navigable in fact. *Id.* at 207, 100 S.Ct. at 400. The petitioners sought access to the canals to engage in fishing and shrimping activities. *Id.* at 207–08, 100 S.Ct. at 400. Vermilion Corporation, the lessee of the canals, sought an injunction against the petitioners from making use of the canals. The Louisiana Court of Appeal granted the corporation's motion for summary judgment notwithstanding a factual dispute over whether "the system of artificial wa-

terways destroyed the navigability of surrounding natural waterways." *Id.* at 209, 100 S.Ct. at 401. Because "the system of artificial waterways was substituted for the pre-existing natural system of navigable waterways," the petitioners argued, "the canals would not be private and could not be privately controlled." *Id.* at 209, 100 S.Ct. at 401. The Supreme Court remanded because these factual allegations, if proved true, may "constitute a defense under federal law to respondent's prayer for injunctive relief." *Id.*

*Vaughn* is inapplicable to this case as the Corps does not argue that the construction of the Lagoon rendered other navigable waters unnavigable.

also found relevant the fact that the pond "was separated from the adjacent bay and ocean by a natural barrier beach." *Id.* Thus, although Kuapa Pond was a natural fishpond reinforced by a stone wall, rather than a fishpond created entirely by an artificial wall, this also is insufficient to require a different result.[17]

▮▮▮▮ The possible prior navigability of the area comprising Puko'o Lagoon in its natural state, while insufficient to impose the navigational servitude as a matter of law, is a relevant factual consideration in determining whether the navigational servitude applies. *United States v. Cress,* 243 U.S. 316, 324, 37 S.Ct. 380, 383, 61 L.Ed. 746 (1917). Even if we assume the navigability of the area prior to the construction of the wall more than 160 years ago, however, we do not believe this transforms the present lagoon into the sort of "great navigable stream" contemplated by the servitude cases. *Kaiser Aetna,* 444 U.S. at 179, 100 S.Ct. at 392.

The Court placed significant weight on the treatment of Kuapa Pond as private property and the reasonable investment-backed expectations of the Pond's owners. This is consistent with the notion that the navigational servitude is grounded in considerations of English common law and notice to the parties of the government's "dominant servitude." *United States v. Rands,* 389 U.S. 121, 122, 88 S.Ct. 265, 266, 19 L.Ed.2d 329 (1967). We need not trace the history of the treatment of fishponds as private property under Hawaiian law, as their private nature is beyond dispute. *See Kaiser Aetna,* 444 U.S. at 166–67, 179, 100 S.Ct. at 385–86, 392; *see also Kaiser Aetna,* 408 F.Supp. at 52 (Hawaiian fishponds were "never subject to any 'common right of piscary,' and [were] never servient to any 'navigation servitude'"). Like the owners of the marina in *Kaiser Aetna,* "the interest of [the Trust] . . . is strikingly

similar to that of owners of fast land adjacent to navigable water." *Id.,* 444 U.S. at 179, 100 S.Ct. at 392.

▮▮▮▮ The Trust purchased the property surrounding and including Puko'o Lagoon in reliance on the private status, under Hawaiian law, of the lagoon. Though reliance on local law is not by itself sufficient to defeat the superior interest of the federal government in the navigational servitude, *see United States v. Rio Grande Dam & Irrigation Co.,* 174 U.S. 690, 704, 19 S.Ct. 770, 775, 43 L.Ed. 1136 (1899), when the expectation of private ownership is based on a right which "has the law back of it[,] . . . courts may 'compel others to forbear from interfering with [it] or to compensate for [its] invasion.'" *Kaiser Aetna,* 444 U.S. at 178, 100 S.Ct. at 392 (quoting *Willow River Co.,* 324 U.S. at 502, 65 S.Ct. at 764). Because of the striking factual similarities with *Kaiser Aetna,* we find that the rights in Puko'o Lagoon, held by the Trust, also have the "law back of them." We agree with the district court that the navigational servitude, dormant or otherwise, has not attached to Puko'o Lagoon. Though the government may regulate Puko'o Lagoon, the Corps' attempt to require public access goes too far; such a requirement may be imposed only by paying compensation under the fifth amendment.

AFFIRMED.

▮▮▮▮▮▮▮▮▮

---

17. This factual difference was also apparently insignificant to native Hawaiians. Although fishponds were distinguished "by the manner in which they were constructed and by the location relative to the sea," both Kuapa Pond and Puko'o Fishpond are considered *loko kuapa. Boone v. United States,* 725 F.Supp. at 1511.